570 P.2d 1268

**WASHINGTON NATIONAL CORPORATION, a Delaware Corporation, Washington National Trust Company, an Arizona Corporation, Washington National Fund, Inc., a corporation, Anchor National Financial Services, Inc., a corporation, Anchor Corporation, a corporation, and James S. Wheeler, Appellants and Cross Appellees,**

v.

**Luceille W. THOMAS, a widow, Brown W. Thomas, Audrey Thomas, Kathryn Jean Thomas, Diane Audrey Thomas, and Brown W. Thomas, as Special Administrator of the Estate of W. Alan Thomas, Deceased, Appellees and Cross Appellants.**

No. 2 CA–CIV 2319.

Court of Appeals of Arizona, Division 2.

Aug. 2, 1977.

Rehearing Denied Oct. 3, 1977.

Review Denied Nov. 1, 1977.

Chandler, Tullar, Udall & Redhair by Robert E. Lundquist, Tucson, for appellant and cross appellee Washington National Corp.

Stockton & Hing by Robert Ong Hing, Phoenix, for appellants and cross appellees

Washington National Trust Co., Washington National Fund, Inc., Anchor National Financial Services, Inc., Anchor Corp., and James S. Wheeler.

Molloy, Jones, Donahue, Trachta & Childers, P. C. by John F. Molloy, Tucson, for appellees and cross appellants.

## OPINION

HOWARD, Chief Judge.

This is an appeal from a judgment of the trial court which found that appellants had violated the Arizona Securities Act and as a result rescinded a trust agreement by and between the deceased, W. Alan Thomas and appellant Washington National Trust Company. The court awarded damages in the sum of $179,970.31 in favor of appellee Luceille W. Thomas and $490,661.44 in favor of W. Alan Thomas and against all appellants. The trial court also voided certain provisions in the last will and testament of W. Alan Thomas and awarded appellees $25,000 attorneys' fees.

For the sake of clarity and brevity the parties whose names are essential to this case will be referred to as follows: Washington National Corporation—WNC; Washington National Trust Company—The Trust Company; Washington National Fund, Inc.—The Fund Company; Anchor National Financial Services, Inc.—Anchor Financial; Anchor Corporation—Anchor; James S. Wheeler—Wheeler; Luceille Thomas—Mrs. Thomas; W. Alan Thomas—Mr. Thomas; and Brown W. Thomas—Son.

Clarification of the relationship between the appellants is also necessary. WNC is a holding company. Since its formation in 1968 it acquired sole ownership of the common stock of Anchor and The Trust Company. Anchor Financial was formed by and is a wholly owned subsidiary of Anchor. The Fund Company is a mutual fund managed by Anchor which is paid a management fee for its services. Wheeler was at all material times employed by Anchor Financial as a registered representative selling mutual funds on commission.

In February of 1972 Wheeler and another salesman from Anchor Financial held a luncheon seminar in Tucson, Arizona which was sponsored by The Trust Company. Mr. and Mrs. Thomas had received an invitation to attend the seminar, the subject of which was "Taxes, Probate and Trust". The object of the seminar was to promote the use of a revocable "living trust" with The Trust Company as the trustee as a vehicle to save probate costs and estate taxes. Those present at the seminar were told that they could obtain the services of The Trust Company as a corporate trustee for only $100 per year provided they invested at least 20% of their estate in the mutual funds of The Fund Company. There was evidence that at the seminar Wheeler made misleading statements concerning the impact of probate costs, delays, and taxes upon a decedent's estate, as well as the amount of the management fees charged by The Fund Company. Since Wheeler's livelihood depended upon the sale of mutual funds, it is a fair inference that he was using the format of a seminar and a living trust to sell mutual funds from which he derived a commission.

Shortly after the seminar Wheeler contacted Mr. and Mrs. Thomas at their home and began importuning them to create a living trust. Mr. and Mrs. Thomas were elderly, aged 76 and 81 respectively. They had come to Arizona in 1963 from Minneapolis, Minnesota where Mr. Thomas had worked many years for Minnesota Mining and Manufacturing Company (3M). During those years he had purchased a large number of shares of the corporation through a stock option plan. At the time of the initial contact by Wheeler, Mr. and Mrs. Thomas had accumulated 24,000 shares of 3M stock with a market value of approximately 3.7 million dollars, returning approximately $40,000 per year income.

Over the next five months Wheeler became a constant visitor of the Thomas household. Mr. and Mrs. Thomas liked him very much and he became a "second son" to them. Wheeler finally "wore them out" and on July 5, 1972, they entered into a trust agreement with The Trust Company

as trustee. The agreements were prepared by an attorney contacted by Wheeler whom they had never seen before.

Each of the Thomases executed a separate revocable trust agreement. The agreements gave the trustee broad discretionary powers in the management of the trust estate. Upon the death of the grantor the trustee was to continue the management and investment of the trust corpus and pay over to their Son so much of the income and principal as the Son requested with the power in the Son to request the entire corpus and thus terminate the trust.

In connection with the execution of the trust agreements Mr. and Mrs. Thomas each executed a last will and testament which contained a "pour over" clause devising the residue of their estate to The Trust Company as trustee of their living trust. The inducement for execution of the trust agreements was tax and probate expense savings. In fact, there were no tax savings over and above what already existed in their previously executed wills, and the probate expense savings were misrepresented.

Mrs. Thomas had poor eyesight and had to read with a magnifying glass. The Thomases had both instructed Mr. Wheeler that any trust agreement was to contain a provision prohibiting the trustee from selling any of the 3M stock which they were going to place in the trust. They were unaware of the broad powers contained in the trust agreements which gave the trustee the authority to sell such stock. Although the terms of the trust agreements were purportedly read to them in the lawyer's office, Mrs. Thomas could not hear what was being said. The Thomases had faith and trust in Wheeler and were relying on him. They believed that what they had told Wheeler would be in the trust agreements. Mrs. Thomas did not recall being told that the trust agreements expressly authorized the trustee to invest in mutual funds managed by Anchor and from past experience, the Thomases did not believe that mutual funds represented a desirable method of investment.

On July 7, 1972, The Trust Company sent the Thomases an acknowledgement that no shares of the 3M stock in the trusts would be sold during their lifetimes without their consent and approval. It also acknowledged the receipt of Mr. Thomas' half of the balance of their 3M stock, 120 shares of Inspiration Copper Company and 200 shares of Archer Daniel's Midland Company.

In order to comply with The Trust Company's requirement that 20% of the estate be invested in mutual funds, the Thomases decided to sell some of their 3M stock. Mrs. Thomas knew that some income tax liability would be incurred, but she was assured by Wheeler not to worry about the tax because " . . . the mutual funds would take care of all of it". The Thomases sold 8,000 shares of 3M stock for a total of $615,380. Each then purchased shares of The Fund Company at a price of $320,-414.50. Since the cost basis of the 8,000 shares was only $1,256 there was a large capital gain resulting in payment of income tax in the sum of $104,268.48 by Mrs. Thomas and the same sum by the estate of Mr. Thomas.

On January 4, 1973, Mr. Thomas had a heart attack. On January 5th, while Mr. Thomas in the hospital, Wheeler brought them Amended Trust Agreements which they both signed. Mrs. Thomas did not read the amended agreements since she trusted Wheeler. The amended agreements substantially changed their Son's rights in the trusts by providing that he was to have only a life estate instead of the absolute right to the entire corpus as provided in the original trust agreements. Mr. Thomas died on January 6, 1973.

On January 23, 1973, 17 days after Mr. Thomas' death, the 3M stock in Mr. Thomas' trust was sold. The Trust Company used the funds to purchase 16,201 shares of The Fund Company for $226,003.95, 18,081 shares of the Investment Company of America for $275,012.01 and 23,667 shares of the Decatur Investment Fund for $275,-010.54. Wheeler and another salesman received commissions of $8,000 on these sales.

After the death of her husband, Mrs. Thomas remained a close friend of Wheeler

until she became aware that contrary to their understanding, the trust agreements allowed the 3M stock to be sold. This caused her to revoke her trust and she sold The Fund Company shares at a loss of $49,628.90.

This suit was filed seeking damages and rescission of the trust agreements. The trial court found that the sale of the 3M stock, which resulted in the large capital gain, and the purchase of the mutual funds from the proceeds of that sale violated the Arizona Securities Act. The court awarded Mrs. Thomas a judgment for $179,970.31 and the Estate of Mr. Thomas a judgment of $490,661.44. It voided the trust as amended and paragraphs 5 and 6 of Mr. Thomas' will on the grounds of over-reaching and mistake. The court further ordered that when the money judgment in favor of the estate was paid in full, the 21,290 shares of The Fund Company held by the The Trust Company as trustee would become the property of such defendants as contributed to the payment of the judgment in proportion to their respective contributions. All the other assets of the trust were ordered delivered to the Son as special administrator of his father's estate. The court also awarded appellees $25,000 attorneys' fees.

## STATUTE OF LIMITATIONS

The original complaint in this action was filed on March 1, 1973 naming The Trust Company, The Fund Company and Anchor Financial as defendants. This complaint alleged no violations of the Arizona Securities Act. An amended complaint was filed January 21, 1974 adding WNC, Anchor and Wheeler as defendants.

A.R.S. § 44–2004(B) states:

"No civil action shall be brought under this article to enforce any liability founded upon a violation of article 13 unless brought within one year after discovery of the fraudulent practice upon which the liability is founded, or after such discovery should have been made by the exercise of reasonable diligence, and in no event shall such action be brought more than three years after the fraudulent practice occurred."

■ Appellants contend that since the alleged security violations and alleged misrepresentations occurred in June of 1972, the above statute precludes recovery. We do not agree. Appellants had the burden of proof as to the statute of limitations. *Lederman v. Phelps Dodge Corporation*, 19 Ariz.App. 107, 505 P.2d 275 (1973). Knowledge and understanding of the contents of the original trust agreements and their amendments would not have alerted the Thomases to the misrepresentations made in June of 1972. If the Thomases fully understood the contents of the original trust agreements and their amendments and pointed out to Wheeler that there were no provisions forbidding the sale of the 3M stock and further objected to the life estate of their Son, for all we know, the agreements would have merely been corrected by The Trust Company to comply with their wishes. It would then be doubtful whether the Thomases would ever have discovered that Wheeler's "estate planning" was unnecessary and only a vehicle for the sale of mutual funds. It was not until the 3M stock in Mr. Thomas' trust was sold that Mrs. Thomas concluded that something was amiss and decided to consult a lawyer who then brought home to her the full extent of Wheeler's conduct. The amended complaint was not barred by limitations.

## THE LIABILITY OF WNC

WNC claims that it should not be held liable for the actions of its wholly owned subsidiary, The Trust Company.

■ A corporation is not liable for the acts of its subsidiary simply because it is wholly owned. The concept of a corporation as a separate entity is a legal fact—not fiction. *Modern Pioneers Insurance Company v. Nandin*, 103 Ariz. 125, 437 P.2d 658 (1968).

WNC originally acquired The Trust Company in 1970, when it was known as the Republic Trust Company, by assuming its existing liabilities of about $125,000 to

$150,000. Since that time The Trust Company had been operating at a loss of approximately $100,000 per year. The necessary capital of $150,000, required by A.R.S. § 6–856 in order to do business in the state of Arizona, was provided by WNC. The trust fees of $100 per trust charged by The Trust Company were the only income generated by The Trust Company and this income was insufficient to pay operating expenses. The loss of $100,000 per year was apparently acceptable in view of the business which would be generated by The Trust Company for the other subsidiaries.

■ Six of the ten directors of The Trust Company were also directors of WNC; however, the mere fact that corporations have the same officers does not make one liable for the acts of the other. *Hubbard v. Capital Southwest Corporation,* 448 S.W.2d 571 (Tex.Civ.App.1969); *American Cyanamid Company v. Wilson & Toomer Fertilizer Company,* 51 F.2d 665 (5th Cir. 1931). Nor does the fact that the parent corporation finances the subsidiary make the subsidiary the agent of the parent corporation. *Owl Fumigating Corporation v. California Cyanide Company, Inc.,* 24 F.2d 718 (D.Del.1928); *Hubbard v. Capital Southwest Corporation,* supra.

Among the factors which courts have considered in disregarding the separate corporateness of a parent corporation and its subsidiary is the inadequate capitalization of the subsidiary. See cases Annot. 63 A.L. R.2d 1042 at p. 1055 et seq. As is stated in Henn, Law of Corporations, 2nd Ed. at pp. 258–259, the corporate identity will be recognized unless " . . . [t]he corporation is inadequately financed as a separate unit from the point of view of meeting its normal obligations forseeable in a business of its size and character, because of either inadequate financing or having its earnings drained off so as to keep it in a condition of financial dependency. . . . " When the facts disclose such undercapitalization, and when observance of the corporate form will sanction a fraud or promote an injustice, the corporate fiction will be disregarded.

■ Instead of having its earnings drained off so as to keep it in a condition of financial dependency, the facts here disclose that The Trust Company was deliberately programmed to lose large sums of money. Without the infusion of $100,000 each year The Trust Company could not meet its normal operating expenses. Allowing WNC to avoid liability by interposing the corporate fiction would work a grave injustice upon the appellees.

■ We conclude that the trial court did not err in awarding a judgment against WNC. We are unable to find, however, any reason for disregarding the corporate entity as far as Anchor is concerned. There is no evidence, other than interlocking directorships, upon which to base a judgment against it for the tortious conduct of its subsidiary Anchor Financial. As to The Fund Company, it is liable under A.R.S. § 44–2003 for damages or rescission in the sale of its mutual funds. But because The Fund Company did not participate in the sale of the 3M stock which incurred the large capital gain, the judgment in favor of Mrs. Thomas against The Fund Company would have to be reduced by the sum of $104,268.48, and the judgment for the estate against The Fund Company would have to be reduced in a like amount.

## CAUSATION AND RELIANCE

Appellants argue that there was no evidence that the conduct of Wheeler caused the Thomases to enter into the trust agreements. They also contend that the Thomases did not rely on Wheeler's representations and if they did, they had no right to do so.

A.R.S. § 44–1991(2) makes it unlawful to "[m]ake any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

■ As we perceive the facts, the Thomases were misled, inter alia, as to the need of creating an inter vivos revocable trust and the monetary savings emanating there-

from. It was not necessary to create the trust, sell the 3M stock and purchase shares in The Fund Company in order to accomplish the tax savings of "generation skipping". The tax savings could have been accomplished in a will. Contrary to appellants' contention that there was no evidence that Wheeler's representations caused the Thomases to enter into the trust agreements, we find that Mrs. Thomas testified:

"Well, as I say, he talked fast and he impressed upon our minds that we were saving so much by going into the trust."

The whole thrust of Wheeler's "pitch" was the tax and probate savings of an inter vivos revocable trust. The testimony below was that the Thomases trusted and relied upon Wheeler, so much so that they considered him a second son. The fact that Wheeler did not know of the misleading nature of his statements, if it be a fact, is not relevant since knowledge of fault is not a necessary element of a cause of action based upon A.R.S. § 44–1991. *Baker v. Walston & Company*, 7 Ariz.App. 590, 442 P.2d 148 (1968).

■ Appellants' contention that the Thomases should not have relied upon the statements made by Wheeler but should have gone to see an attorney and a tax expert is without merit. The statute imposes an affirmative duty not to mislead. Contributory negligence is not a defense to this statutory violation.

### NO VIOLATION OF A.R.S. § 44–1991

■ Appellants contend that since there are no representations as to the value of the 3M stock which the Thomases sold in June 1972 or the value of the shares of The Fund Company which the Thomases purchased in June of 1972, there was no violation of A.R.S. § 44–1991. We do not agree. This argument was expressly rejected in *A. T. Brod & Company v. Perlow*, 375 F.2d 393 (2d Cir. 1967). There the court was dealing with a federal regulation similar to our A.R.S. § 44–1991, which statute patently contains no language suggesting that it was intended to deal only with fraud and misleading statements as to the "investment value" of securities.

A.R.S. § 44–2001 states:

"A sale or contract for sale of any securities to any purchaser in violation of any provision of §§ 44–1841, 44–1842 or article 13 of this chapter, is voidable at the election of the *purchaser*, who may bring an action in a court of competent jurisdiction to recover the consideration paid for the securities, with interest thereon, taxable court costs and reasonable attorneys' fees, less the amount of any income received by dividend or otherwise from ownership of the securities, upon tender of the securities purchased or the contract made, or for damages if he no longer owns the securities." (Emphasis added)

■ Appellants argue that since the purchaser of The Fund Company shares and the other shares of mutual funds in both of the trusts was The Trust Company and not Mr. or Mrs. Thomas, the above statute is not available as a remedy for appellees. In other words, appellants contend that only The Trust Company could void the purchases or sue for damages. Although the legal title here was in the trustee, the Thomases held the equitable title to the corpus of the trust and were, for the purposes of A.R.S. § 44–2001, "purchasers". See, *James v. Gerber Products Company*, 483 F.2d 944 (6th Cir. 1973).

### LACK OF DAMAGE

■ Appellants contend appellees have suffered no damage. In the period from June 1973 to January 1975 a sharp decline in the stock market occurred. Because of this situation, The Trust Company, in December of 1974 and January of 1975, offered to liquidate all assets in Mr. Thomas' trust and to purchase and tender back to Mr. Thomas' estate the same number of 3M shares which The Trust Company originally held, save and except for shares which would have been required to be sold to pay estate taxes which would have been incurred whether or not the trust was created. Appellants refused to permit the trus-

tee to take such action. Furthermore, appellants point out that the 8,000 shares of 3M stock were sold in June of 1972 for a net, after deducting the income taxes, of $410,000. They contend no loss was suffered since, if the Thomases had not sold that stock but had kept it as Mrs. Thomas stated they intended to do, such stock would have been worth only $354,000 in January of 1975. This argument is without merit. The purchase of the securities by The Trust Company was voidable under A.R.S. § 44–2001 which specifically allows recovery of the consideration paid for the securities. The sale of the 8,000 shares of 3M stock was voidable under A.R.S. § 44–2002 which permits the sellers, the Thomases, to bring an action to recover the amount of their damages. The taxes paid on the capital gain are an element of damages. *Stevens v. Abbott, Proctor & Paine*, 288 F.Supp. 836 (E.D.Va.1968). Whether the Thomases would never have sold the 3M stock is as speculative as the arbitrary date of January 1975 which appellants have chosen for the date of valuation. There is no reason to believe that the Thomases, who appellants first claim would not part with their 3M stock for any reason, would sell their stock when it reached its lowest value. A similar argument by a plaintiff seeking to enhance her damages was rejected by the court in *Courtland v. Walston & Co., Inc.*, 340 F.Supp. 1076, 1093 (S.D.N.Y.1972):

> " . . . [T]he date of December 31, 1965, selected by plaintiff as the date to which she hopefully would have held her original investments, and then sold, were it not for defendants' conduct, and realized a substantial profit, is unsupported by any evidence and unrealistic in the extreme."

Appellants argue that Wheeler urged the Thomases to use their $300,000 in cash and fewer 3M shares in order to avoid payment of capital gains taxes. Had they done so they would have cut the capital gains taxes in half. They therefore contend that the loss in capital gains taxes was self-inflicted and not directly traceable to the misleading statements made by Wheeler. We do not agree. Appellants cannot complain as to

the course chosen by appellees in their reaction to the misleading statements. In any event, the Thomases were not obliged to strip themselves of their cash, especially in view of the representation that the "fund" would take care of any capital gains tax.

## THE GRANTING OF RESCISSION AND DAMAGES

█ Appellants argue that as to the transactions which occurred in June of 1972 appellees are not entitled to both rescission and damages. Mrs. Thomas rescinded her trust agreement in February of 1973. The trust agreement was also rescinded as to Mr. Thomas. Appellants claim that by awarding money damages equivalent to the amount of cash generated by the sale of the 3M stock in June 1972, the court gave the appellees damages and in effect put them in a better position than they would have been had they not entered into the transactions with The Trust Company. We do not agree. A.R.S. § 44–2001, by allowing the purchaser to recover consideration paid for the securities, is in effect a statutory rescission and their recovery of the consideration paid for the mutual funds was not "damages". In any event, in a case involving misrepresentation the court will allow both rescission and damages where rescission alone will not adequately compensate the plaintiff. *Jennings v. Lee*, 105 Ariz. 167, 461 P.2d 161 (1969). Both rescission and damages have been awarded by the federal courts in cases involving violation of the Federal Security Laws. See, *Errion v. Connell*, 236 F.2d 447 (9th Cir. 1956). The damages recovered for the sale of the 8,000 shares of 3M stock involved a separate and distinct section of the Arizona Securities Act, A.R.S. § 44–2002 which allows the recovery of damages.

## APPELLANTS' RIGHT TO CREDIT ON THE JUDGMENT

█ Appellants claim that assuming the award of tax damages was proper they are entitled to a reduction in the amount of the award as a result of federal tax credit in

the next year for the capital gains taxes paid to the state. We do not agree. The unfairness of giving appellants credit for this deduction is obvious since when the judgment is collected the recovery will be taxed to the appellees. 1 Merten's Federal Income Taxation, § 7–34.

## THE CROSS CLAIM

After the death of Mr. Thomas The Trust Company, in January of 1973, sold the 3M stock in his trust and purchased $776,026.50 in mutual funds. Although it rescinded the trust agreement, the trial court did not order repayment of the above amount by the appellants to the estate of Mr. Thomas.

A.R.S. § 44–1991 provides in part:

"It is a fraudulent practice and unlawful for a person, *in connection* with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities . . . directly or indirectly to do any of the following:

1. Employ any device, scheme or artifice to defraud.

2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit."

The purpose of A.R.S. § 44–2001 and § 44–2002 is to place the injured party in the same position *monetarily* that he was in prior to the violation of the statute. Remedial statutes are to be liberally construed. *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 521 P.2d 1119 (1974); *Bullard v. Garvin*, 1 Ariz.App. 249, 401 P.2d 417 (1965).

Wheeler's "estate planning" was a thinly disguised scheme to sell mutual funds. When the 3M shares were handed over to The Trust Company it was contemplated that these shares could be sold. The sale of the 3M shares and the purchase of the mutual funds were connected to and caused by Wheeler's representations. Thus, the estate of Mr. Thomas is entitled to receive the consideration paid for these shares, less the amount of any income received by dividend or otherwise from ownership of the securities.

## THE AWARD OF ATTORNEYS' FEES

Counsel for appellees testified at trial that a reasonable attorneys' fee would be the sum of $40,000. There was, however, testimony which would justify the court in reducing that amount and we do not believe that the trial court abused its discretion in awarding the sum of $25,000.

## SUMMARY

The judgment against Anchor Corporation is reversed and the trial court is ordered to enter a judgment in favor of Anchor Corporation and against appellees.

The judgment in favor of Luceille Thomas and against The Washington National Fund is modified by reducing the amount of the judgment by the sum of $104,268.48. The judgment in favor of Brown W. Thomas as special administrator of the Estate of W. Alan Thomas, deceased, and against Washington National Fund is modified by reducing the amount of the judgment by the sum of $104,268.48.

The judgment against all appellants, except Anchor Corporation, and in favor of Brown W. Thomas, as special administrator of the Estate of W. Allan Thomas, deceased, is modified by increasing the amount of the judgment by the sum of $776,026.50 plus interest from January 23, 1973 to date of judgment on March 4, 1976 less any credits allowable to said appellants under A.R.S. § 44–2001 and further modified to provide that the title to shares purchased by said sum and now held by Brown W. Thomas, as special administrator for the Estate of W. Alan Thomas, deceased, shall become the property of whichever appellants contribute to satisfaction of the judgment in proportion to their respective contributions.

The judgments are affirmed as modified. Appellees have asked for attorneys' fees on appeal and we believe that the sum of $5,000 is a reasonable amount. We therefore award appellees such sum as attorneys' fees on appeal.

HATHAWAY and HAIRE, JJ., concur.