577 P.2d 725

**IZE NANTAN BAGOWA, LTD., a corporation, and David M. Baker, M. D., Appellants,**

v.

**Joni Lynn SCALIA, M. D., Appellee.**

**No. 2 CA–CIV 2543.**

Court of Appeals of Arizona, Division 2.

Jan. 24, 1978.

Rehearing Denied March 9, 1978.

Review Denied April 11, 1978.

Knez, Glatz & Crites, P. C. by Richard D. Crites, Tucson, for appellants.

Slutes, Browning, Zlaket & Sakrison, P. C., by Eugene F. Zlaket, Tucson, for appellee.

## OPINION

HOWARD, Judge.

The sole issue here is whether the trial court erred in "piercing the corporate veil" and imposing personal liability on appellant Baker.

The record shows that Dr. Baker, a medical doctor, formed a professional corporation pursuant to A.R.S. § 10–901 et seq. The corporation, Ize Nantan Bagowa, Ltd., hereinafter referred to as INB, was issued a certificate of incorporation on October 18, 1972. Pursuant to A.R.S. § 10–908 the articles of incorporation provided that the private property of the shareholders was exempt from liability for corporate debts except those set forth in A.R.S. § 10–905.[1] As is permitted by A.R.S. § 10–908(4), Dr. Baker was the only officer and director of the corporation.

INB was originally established to create a statewide interlocking system of emergency room care. However, under its articles of incorporation it had the right to engage in every aspect of the practice of medicine and surgery. The corporation succeeded in obtaining emergency room contracts with two hospitals, Tucson Medical Center and Pima County Hospital. The contract between Tucson Medical Center and INB was effective as of February 1, 1973. By its terms, Tucson Medical Center guaranteed INB $176,000 a year for emergency room services, payable in 12 equal monthly installments. This contract was terminable by either party upon 60-days' notice. As far as the contract with Pima County Hospital is concerned, the record only discloses that it was terminated in June of 1974.

In order to provide the emergency room services called for in its contracts, INB entered into written employment contracts with physicians, including appellee. Her contract provided that she was to receive $2,700 per month, vacation time and two months' "severance pay" if her employment was involuntarily terminated without fault on her part. The agreement was for a period of one year and terminated on August 31, 1974.

The income from the Tucson Medical Center contract was deposited in the INB bank account and, in turn, sums were withdrawn from the INB bank account and deposited into a separate checking account called "Tucson Emergency Physicians". This latter account provided the sums necessary to pay the doctors who were under contract with INB. The reason for setting up this separate account was that the initial concept envisioned emergency room service contracts in other cities. Therefore, if INB succeeded in getting an emergency room contract for example, in Kingman, INB would have created a separate "Kingman Emergency Physicians" account to pay the Kingman doctors.

On August 15, 1973, a clinic was started in Tucson called "Rincon Family Practice Clinic". It had its own bank account, "Rincon Family Practice", a Division of Ize Nantan Bagowa, Ltd." Theoretically, any profits from the operation of the family practice clinic would be passed to INB. However, there was no such profit prior to January 1, 1974, a date the significance of which we will discuss later.

INB borrowed $25,000 from a local bank to fund the Rincon Family Practice Clinic. In August and September of 1973, INB transferred $20,000 from its bank account to the Rincon Family Practice checking account. In October, November and December of 1974, Rincon Family Practice received $10,000 from INB for current operating expenses. On January 29, 1974, INB transferred another $1,000 to the Rincon Family Practice Clinic account for current operating expenses.

Upon the advice of a professional planner, it was decided that the Rincon Family

---

1. This statute provides that the professional person is still responsible to respond in damages for malpractice.

442

Practice Clinic should operate as a separate corporation. A professional corporation was formed by Dr. Baker as the sole incorporator, officer and director and the Rincon Family Practice Clinic received a certificate to do business dated January 1, 1974.

The minutes of a special meeting of the board of directors of INB held on January 15, 1974 show the following entry:

"Dr. Baker discussed the separation of the Rincon Family Practice Clinic from this corporation and stated that the corporation is now functioning as a professional corporation. Dr. Baker stated that all of the property in the Clinic had been purchased by the Clinic and that there is no further property to be transferred. The loan which was used to purchase the equipment has been assumed by Rincon Family Practice Clinic. Dr. Baker further stated that the lease of the physical plant of Rincon Family Practice Clinic was being paid by the new professional corporation. . . ."

As indicated in the above minutes, Rincon Family Practice Clinic assumed payment of the $25,000 note. Although approximately $1,500 had been paid on the note by INB, most of the payment went towards interest and did not reduce the principal to any appreciable extent.

When the emergency room contract with Tucson Medical Center expired in 1974, Tucson Medical Center asked for bids. INB could not underbid a California corporation, which won the contract from Tucson Medical Center. The contract with Pima County Hospital having also expired in June of 1974, INB was unable to secure any other emergency room contracts which would be financially profitable. Therefore, it ceased doing business in June of 1974, at which time, INB owed approximately $26,226 which consisted of taxes owed to the United States government and debts to Drs. Scalia, McFarlane and Orozco. The only other asset INB owned in June, a 1973 Pontiac automobile, was transferred to Rincon Family Practice Clinic which assumed the note and mortgage on the auto. The balance due on the note was greater than the value of the automobile. In 1973, INB suffered an operating loss of nearly $20,000. In 1974, its net income was $1,784.89.[2]

Prior to the incorporation of Rincon Family Practice Clinic, Dr. Baker received a salary of $5,000 per month which represented $4,000 for his duties in connection with the emergency room services and $1,000 per month for his duties with Rincon Family Practice. Starting January 1, 1974, he continued to draw $5,000 per month but the sources and amounts were reversed, in other words, he received $4,000 per month from Rincon Family Practice and $1,000 per month from the emergency room services.[3]

■ The courts have conditioned recognition of corporateness on compliance with two requirements: (1) business must be conducted on a corporate and not a personal basis; (2) the enterprise must be established on an adequate financial basis. Henn, Law of Corporations 2nd Ed., § 147 (1970). The corporate fiction will be disregarded when the corporation is the alter ego or business conduit of a person, and when to observe the corporation would work an injustice. The alter ego status is said to exist when there is such a unity of interest and ownership that the separate personalities of the corporation and the owners cease to exist. *Dietel v. Day*, 16 Ariz.App. 206, 492 P.2d 455 (1972). *Employers' Liability Assurance Corporation v. Glens Falls Insurance Company*, 12 Ariz.App. 362, 470 P.2d 682 (1970).

■ However, the mere fact that it is a one-man corporation does not mean the corporation is the alter ego of that one man. Thus, in *Bass v. Shutan*, 259 F.2d 561 (9th Cir. 1958) the court held that Zipco Incorporated was not the alter ego of its sole shareholder, director, president and general manager.

■ Although the Arizona statutes governing professional corporations authorize a

---

2. The record does not disclose whether this was net income before or after taxes.

3. There was no testimony that these salaries were excessive.

one-man corporation, this does not mean that the corporate entity can be disregarded. In a law review article the author states:

"Imposition of personal liability is reasonable and understandable where there has been a complete or almost complete assimilation of the two identities, as where the shareholder uses corporate capital for private purposes, thereby depleting the corporate reservoir of assets which otherwise would be available to creditors, or where he has mixed corporate and personal accounts in such inextricable confusion that they cannot be segregated. . . ." Fuller, The Incorporate Individual: A Study Of The One-Man Company, 51 Harv.L.Rev. 1371, 1381 (1938).

The record here is indeed sparse. The only relevant documentary evidence consists of the corporate minute book, the contract of employment between INB and appellant and the contract between INB and Tucson Medical Center. The trial court was not provided with the financial records, balance sheets or financial statements of either INB or Rincon Family Practice. The corporate minute book of INB shows that its corporateness was never disregarded as far as the formal conduct of INB was concerned.

Appellee contends there are three facts which support the trial court's conclusion that Dr. Baker should be personally liable: (1) undercapitalization of INB; (2) the use of INB general funds to support Rincon Family Practice and (3) the stripping of the assets of INB.

■■■ Undercapitalization, where it is clearly shown, is an important factor in determining whether the doctrine of alter ego should be applied.[4] However, in the absence of fraud or injustice to the aggrieved party, it is not an absolute ground for disregarding a corporate entity. In any event, it is incumbent upon the one seeking to pierce the corporate veil to show by a preponderance of the evidence that the financial setup of the corporation is only a sham and causes an injustice. Undercapitalization cannot be proved merely by showing that the corporation is now insolvent. *North Arlington Medical Building, Inc. v. Sanchez Construction Company*, 86 Nev. 515, 471 P.2d 240 (1970). The record here is devoid of any evidence as to the capitalization of INB and therefore appellee's theory on this score must fail.

■■■ Appellee maintains that before Rincon Family Practice was incorporated, it was the alter ego of Dr. Baker because it could not be a "division" of INB. She asserts that the word "division" is a word of art and refers to a separate corporation operated and controlled by a large parent corporation. Therefore, she argues, any funds paid to Rincon Family Practice prior to January 1, 1974 were in reality paid to Dr. Baker personally. We cannot agree. Failure to separately incorporate Rincon Family Practice prior to January 1, 1974, does not ipso facto make it the alter ego of Dr. Baker. Its operation was part of INB and was authorized by both the articles of incorporation and INB.

While it is true that INB assets were transferred to Rincon Family Practice after its incorporation, the record is devoid of any evidence as to the value of those assets. The record does disclose, however, that Rincon Family Practice assumed the payment on the $25,000 note to the bank, and the note and mortgage on the automobile that was transferred to it. This can hardly be regarded as a stripping of assets. As to the $1,000 paid to Rincon Family Practice after its incorporation, appellant's explanation was that he did not know at the time the funds were transferred that a certificate of incorporation had been issued. In any event, any claim for the $1,000 would have to be asserted against Rincon Family Practice. The payment of the $1,000 to Rincon Family Practice at a time when INB was presumably insolvent may be grounds to

4. See, *Associated Vendors, Inc. v. Oakland Meat Company*, 210 Cal.App.2d 825, 26 Cal. Rptr. 806 (1962) for a comprehensive list of factors with supporting cases mentioned by the court in determining whether or not to disregard the corporate entity.

secure the return of the funds from Rincon Family Practice but does not make Dr. Baker individually liable.

The record here does not show that Rincon Family Practice was incorporated to defraud appellee. She received her salary according to the terms of the contract before and after its incorporation. The inability of INB to pay appellee resulted from its failure to renew its contract with Tucson Medical Center. At all times appellee knew that she was dealing with a corporation, INB, and there is no evidence to support the conclusion that the corporate veil should be pierced in order to impose personal liability on Dr. Baker.

The judgment of the trial court is reversed with directions to enter judgment in favor of appellant David M. Baker, M.D.

RICHMOND, C. J., and HATHAWAY, J., concur.