700 P.2d 902

**BISCHOFSHAUSEN, VASBINDER, AND LUCKIE, Plaintiff/Appellant,**

v.

**D.W. JAQUAYS MINING AND EQUIPMENT CONTRACTORS CO., an Arizona corporation; D.W. Jaquays and Ethelyn Jaquays, husband and wife, Defendants/Appellees.**

**No. 2 CA–CIV 5220.**

Court of Appeals of Arizona, Division 2, Department A.

April 17, 1985.

Harrison & Lerch, P.C. by Mark I. Harrison, Douglas R. Christian and Bonnie C. Gordon, Phoenix, for plaintiffs/appellants Bischofshausen & Vasbinder.

Sparks & Siler, P.C. by Joe P. Sparks and Kevin T. Tehan, Scottsdale, for plaintiff/appellant Luckie.

Robbins & Green, P.A. by Jill H. Grossman, Phoenix, for defendants/appellees.

OPINION

HOWARD, Judge.

Appellants sued for damages for personal injuries allegedly caused by exposure to asbestos particles. Among the many defendants in the case are Jaquays Mining Corporation (Mining Corporation), D.W. Jaquays Mining & Equipment Contractors Company (Equipment Company) and D.W. Jaquays and his wife Ethelyn Jaquays. The complaint alleged, inter alia, claims for relief based on negligence and nuisance against Mining Company, Equipment Company and the Jaquays. The Jaquays and Equipment Company moved for summary judgment which was granted by the trial court. Appellants contend that there still exist legal theories and disputed material issues of fact which precluded summary judgment. We agree and reverse.

The facts considered in the light most favorable to appellants are as follows: The City of Globe has been and is presently the site of several asbestos mills. One of these was operated by Mining Corporation. Mining Corporation was incorporated on April 25, 1952, by D.W. Jaquays his wife Ethelyn Jaquays, and his brother Glenn A. Jaquays. When Mining Corporation was formed, D.W. Jaquays was president, Glenn A. Jaquays was vice-president and Ethelyn Jaquays was secretary/treasurer. D.W. Jaquays and Ethelyn Jaquays have held their respective offices continually since the original incorporation. Prior to forming Mining Corporation, D.W. Jaquays procured a lease and option to purchase certain asbestos claims and an agreement to purchase certain unpatented lode mining claims and the Globe mill site. He and his wife assigned these lease options and purchase agreements and the Globe mill site to Mining Corporation for 6,000 shares of capital stock of the corporation. At the time of incorporation, this represented 48 per cent of the corporate stock. Relatives of the Jaquays family held the balance of the stock. To date, D.W. and Ethelyn Jaquays are still the majority share holders in Mining Corporation, jointly owning approximately 60 per cent of the stock.

The principal place of business of Mining Corporation is in Globe, Arizona. It is located to the east of Mountainview Mobile Homes Estates subdivision and is adjacent to it. The mill is located on 15 acres of contiguous land with a 1,700-foot frontage on Highway 70. The asbestos milling operation, which is presently owned by Mining Corporation, sits on property which was originally acquired by D.W. Jaquays by filing ten mill-site claims with the Forest Service, United States Department of Agriculture, on February 13, 1958. Three of these sites were patented on February 2, 1961. When the asbestos mining facility was built on this property, its construction was financed in part by loans and advances of $133,000 from Equipment Company. Twenty-four per cent of the Mining Corporation stock was issued to Equipment Company in exchange for this assistance.

Mining Corporation's business consisted of mining and milling asbestos ores. In order to identify Mining Corporation more closely with its product, the corporation at one time operated under the name "Jaquays Asbestos Corporation." Jaquays Asbestos Corporation purchased tons of asbestos from the United States General Services Administration in the 1960s and 1970s.

In 1955 Equipment Company was incorporated by D.W. and Ethelyn Jaquays. Until May 1, 1983, D.W. and Ethelyn Jaquays jointly held 99 per cent of the Equipment Company stock. D.W. Jaquays was president of Equipment Company from its inception until May 1, 1983. The principal place of business of Equipment Company is 1219 South 19th Avenue, Phoenix, Arizona. From the time of its inception to the present, Equipment Company has been engaged exclusively in the business of selling, leasing, distributing and occasionally manufacturing mining equipment and supplies. Equipment Company has never engaged in the mining or milling of asbestos ore and does not cater in any way to asbestos mining or milling companies. It sells its products to anyone.

Equipment Company held 24 per cent of the Mining Corporation stock for approximately 15 years. This stock was eventually distributed as a dividend to the shareholders of Equipment Company in accordance with their percentages of ownership.

In approximately 1975, Mining Corporation began losing money. Equipment Company began loaning money to Mining Corporation on an as-needed basis. The decision to loan Mining Corporation money from Equipment Company was a decision made solely by D.W. Jaquays. Mining Corporation eventually became indebted to Equipment Company for $217,000 in loans and supplies. These loans were made to cover expenses of operation. Equipment Company eventually demanded satisfaction of the $217,000 debt, and on December 15, 1980, Mining Corporation transferred both its real property and its mill facility located adjacent to the subdivision to Equipment Company in satisfaction thereof. At the time of the transfer D.W. Jaquays valued the property at $300,000. Equipment Company gave Mining Corporation an $83,000 note, payable on demand, to make up for the excess value of the property. Equipment Company owned the milling facility and the real property continuously for two years, during which time it leased the property back to Mining Corporation. The lease expired on December 28, 1982. In December 1980 the Arizona Department of Health Services (ADHS) and Governor Bruce Babbitt declared the subdivision a disaster area. In late 1980 and early 1981 ADHS made demands on Mining Corporation for correction of circumstances existing around the outside of the milling facility. These requests included dust control, covering piles of asbestos and modifying the loading and unloading facilities at the mill building.

On December 28, 1982, Equipment Company conveyed the land and improvements back to Mining Corporation in exchange for the cancellation of the $83,000 promissory note and $100,000 worth of mining equipment. No independent appraisal was obtained on the mining equipment at the time of the exchange. There was also no professional valuation of the land and improvements at the time of the transfer back to Mining Corporation.

Equipment Company maintained a branch store in Globe, Arizona, which is located in the Mining Corporation mill building. Frank Stevenson, the superintendent of Mining Corporation, also managed the branch store for Equipment Company. The branch store kept a basic inventory of mining supplies and explosives.

Until December 1982, D.W. Jaquays owned the office building located at 1219 South 19th Avenue in Phoenix where Equipment Company headquarters is located. Mining Corporation's business office is also located in this building. There are four offices in the building. Equipment Company uses three offices and Mining Corporation uses one. Mining Corporation does not use other facilities available in the building. Equipment Company has a long-term lease for the entire building and pays $1,500 per month to the Jaquays' daughter for rent. Equipment Company has subleased one office in the building to Mining Corporation for a period of five years. The building has one customer entrance for both companies. Both companies share the same telephone number and anyone answering the telephone answers it for both Mining Corporation and Equipment Company. Both companies share a bookkeeper. When the bookkeeper works for Equipment Company she is compensated separately by it. The same is true of Mr. Stevenson, the part-time employee of Equipment Company. He is compensated separately by it for any services he performs for it. The two corporations have no other shared employees. Equipment Company employs a total of nine additional people other than the shared bookkeeper and Mr. Stevenson.

Equipment Company and Mining Corporation have separate office supplies and separate letterheads. Neither Mining Company nor the Jaquays individually ever use any of the vehicles owned by Equipment Company. The two corporations have al-

ways had separate bank accounts and the Jaquays have never had personal bank accounts in common with the corporate bank accounts.

D.W. Jaquays stated that he was the individual most responsible for making decisions, both policy decisions and everyday working decisions, on behalf of both Equipment Company and Mining Corporation. Jaquays stated that when Equipment Company loaned Mining Corporation $133,000 toward building the mill, none of the shareholders participated in that decision. In approximately 1975, when Equipment Company began loaning money to Mining Corporation on an as-needed basis, D.W. Jaquays stated that the decision to loan money from Equipment Company to Mining Corporation was his decision as well. He also testified that these corporate decisions were not the result of formal corporate meetings. No notice was given for these meetings nor was an agenda prepared, and a meeting consisted of himself and Douglas R. Lindsey, who was both vice-president of Mining Corporation and general manager of Equipment Company. However, with respect to the loans made by Equipment Company to Mining Corporation, all of the loans were carried on the books of both corporations and the major decisions regarding the transfer of the assets from Equipment Company to Mining Corporation and back to Equipment Company were the subjects of corporate resolutions. D.W. Jaquays also testified that prior to effecting that particular transaction, the transfer of the assets, he did consult with his brother, who was a shareholder of Mining Corporation at that time.

Douglas Lindsey testified that on a day-to-day basis he made the decisions for Equipment Company as to from whom they would buy and what they would buy, and that when there were major financial decisions he would consult with D.W. Jaquays. Although Lindsey became the vice-president of Mining Corporation in the late 1970s, he never performed any duties for Mining Corporation except for a few months in late 1980 and early 1981 when D.W. Jaquays was ill. At that time he

acted only as an intermediary between D.W. Jaquays and Stevenson, the superintendent of the mine.

Appellants have four theories of liability which they contend prevented the trial court from properly granting summary judgment. (1) Mr. and Mrs. Jaquays are individually liable for the torts of Equipment Company based on a piercing of the corporate veil; (2) Mr. and Mrs. Jaquays are individually liable premised upon the tortious conduct of D.W. Jaquays while president of Mining Corporation and Equipment Company; (3) Equipment Company is liable as the owner of the property during the two years it owned and leased it to Mining Corporation and (4) Equipment Company is liable premised upon its control over Mining Corporation and its unity and identity with it.

We agree that the facts present theories of liability based on the alleged tortious conduct of D.W. Jaquays and upon Equipment Company's status as a landlord, but not on the other two theories.

I.

## PIERCING THE CORPORATE VEIL

In *Ize Nantan Bagowa, Ltd. v. Scalia,* 118 Ariz. 439, 577 P.2d 725 (App.1978), we discussed when the corporate fiction will be disregarded and liability imposed on the individual shareholders:

"The courts have conditioned recognition of corporateness on compliance with two requirements: (1) business must be conducted on a corporate and not a personal basis; (2) the enterprise must be established on an adequate financial basis. Henn, Law of Corporations 2nd Ed., § 147 (1970). The corporate fiction will be disregarded when the corporation is the alter ego or business conduit of a person, and when to observe the corporation would work an injustice. The alter ego status is said to exist when there is such a unity of interest and ownership that the separate personalities of the corporation and the owners cease to exist.

*Dietel v. Day,* 16 Ariz.App. 206, 492 P.2d 455 (1972). *Employers' Liability Assurance Corporation v. Glens Falls Insurance Company,* 12 Ariz.App. 362, 470 P.2d 682 (1970)." (Emphasis in original) 118 Ariz. at 442, 577 P.2d at 728.

■ Appellants contend that the following facts show there exists a viable claim premised on piercing the corporate veil and holding Mr. and Mrs. Jaquays individually liable: (1) They own 99 per cent of the stock in Mining Corporation; (2) the annual reports filed with the corporation commission for the years 1979 to 1982 suggest that Mining Corporation was undercapitalized; (3) the mill site was originally acquired by Mr. Jaquays in his individual capacity; (4) the loan made by Equipment Company to Mining Corporation in 1969 in the amount of $133,000 was based upon a decision made by Mr. Jaquays alone and without any participation by the other shareholders; (5) in 1975, based upon the unilateral decision of Jaquays, Equipment Company began loaning Mining Corporation sums of money on an as-needed basis.[1]

We do not believe the evidence here, considered separately or together, gives rise to an inference or creates a doubt as to whether there was such a unity of interest and ownership that the separate personalities of the corporation and the owner ceased to exist. The facts show no more than that the corporations were run in the same informal manner as is usually seen in closely held corporations. Appellants urge that Mining Corporation should have had more assets if it was going to engage in the ultra-hazardous activity of mining asbestos and therefore there exists a question of fact as to whether it was undercapitalized, thus allowing a piercing of the corporate veil. Without commenting on the efficacy of the premise upon which this argument is based, we find it to be without merit. In *Norris Chemical Co. v. Ingram,* 139 Ariz. 544, 679 P.2d 567 (App.1984) we held that the adequacy of capital is to be measured as of the time of the formation of the corporation. Appellants rely on the annual reports filed with the corporation commission commencing in 1979. Mining Corporation was founded in 1952. The record is devoid of evidence as to its capitalization at that time.

## II.

### UNITY BETWEEN THE CORPORATIONS

■ Appellants' contention that there exists a question of fact as to the unity between Equipment Company and Mining Corporation is also without merit. In *Washington National Corporation v. Thomas,* 117 Ariz. 95, 570 P.2d 1268 (App. 1977), overruled on other grounds in *Greenfield v. Cheek,* 122 Ariz. 57, 593 P.2d 280 (1979), we were dealing with a corporate subsidiary situation. We first observed that a corporation is not liable for the acts of its subsidiary simply because it is wholly owned and that the concept of a corporation as a separate entity is a legal fact—not fiction. We also noted that the mere fact that two corporations have the same officers does not make one liable for the acts of the other. Nor does the fact that the parent corporation finances a subsidiary makes the subsidiary the agent of the parent corporation. Appellants rely on the fact that the two corporations were housed in the same building, that they had the same telephone number, that they shared a bookkeeper and another employee and the fact that Equipment Company at one time owned 24 per cent of the stock of Mining Corporation as showing that Mining Corporation was an agent for Equipment Company and therefore that Equipment Company should be liable for the acts of Mining Corporation. We do not agree. See *Washington National Corporation v. Thomas,* supra.

1. Appellants do not discuss the second prong necessary to pierce the corporate veil—fraud or the working of an injustice.

## III.

### LANDOWNER LIABILITY

On December 15, 1980, Equipment Company became the owner of Mining Corporation property located adjacent to the subdivision. Both the real property and the improvements thereon were transferred outright to Equipment Company by Mining Corporation in satisfaction of a pre-existing debt. Equipment Company then leased the mill site back to Mining Corporation.

██ In December 1980 the ADHS and Governor Babbitt declared the subdivision in Globe a disaster area. At that time ADHS contacted Jaquays for correction of the circumstances existing around the outside of Mining Corporation's milling facility. Specifically, ADHS was concerned about the control of asbestos dust, covering piles of asbestos and modifying the loading and unloading facilities at the mill.

Restatement (Second) of Property § 18.1 (1977) states:

"A landlord who transfers the possession of the leased property in a condition which he realizes, or should realize, will involve unreasonable risk of physical harm to others outside the leased property, is subject to the same liability of a physical harm subsequently caused to them by the condition as though he had remained in possession."

In *Dow Chemical Finance Corporation v. Marana Associates*, 128 Ariz. 47, 623 P.2d 836 (App.1981) we had occasion to apply the foregoing section of the Restatement and stated that the landlord's liability in such cases exists not as a result of any action or inaction on the part of the tenant but is based upon the landlord's own failure to eliminate the dangerous condition when the leased property was under his full control. Equipment Company argues that there is no evidence that the principals of Equipment Company realized or should have realized that the conditions that existed on the land presented an unreasonable risk of harm. We do not agree. The record reflects that D.W. Jaquays either had direct or indirect knowledge from Lind-

sey that ADHS and the governor had declared the subdivision a disaster area because of the asbestos problem. The property upon which the asbestos mining and milling was taking place was adjacent to the subdivision. This evidence is sufficient to infer knowledge on the part of the principals of Equipment Company. There exists also a claim against Equipment Company based upon a nuisance theory. Restatement (Second) of Torts § 837(1) (1979) states:

"A lessor of land is subject to liability for a nuisance caused by an activity carried on upon the land while the lease continues and the lessor continues as owner, if the lessor would be liable if he had carried on the activity himself, and

(a) At the time of the lease the lessor consents to the activity or knows or has reason to know that it will be carried on, and

(b) He then knows or should know that it will necessarily involve or is already causing the nuisance."

Here, Equipment Company knew the purpose to which the land would be put when it executed the lease with Mining Corporation and was already on notice that the milling activity was creating a nuisance for surrounding property owners because of the asbestos. Equipment Company would have been liable in nuisance if it had carried on the activity itself rather than leasing the property. There appears to be a sufficient factual issue under this theory also so as to preclude the granting of summary judgment.

## IV.

### INDIVIDUAL LIABILITY OF CORPORATE OFFICERS

██ Corporate directors are not personally liable for torts committed by the corporation or by one of its officers merely by virtue of the office they hold. To be held liable, the directors or officers must participate or have knowledge amounting to acquiescence or be guilty of negligence in the management or supervision of the corporate affairs causing or contributing to

the injury. *Jabczenski v. Southern Pacific Memorial Hospitals, Inc.,* 119 Ariz. 15, 579 P.2d 53 (App.1978). D.W. Jaquays stated in his deposition that he was the individual responsible for making most decisions, both policy decisions and everyday working decisions, on behalf of both Equipment Company and Mining Corporation. If there is the slightest doubt whether there is an issue of fact in ruling on the motion for summary judgment, such a doubt should be resolved in favor of a trial on the merits. *Jabczenski v. Southern Pacific Memorial Hospitals,* supra. There remains here a factual issue, as to the extent of Jaquays' involvement with the torts which were being committed on the land adjacent to the subdivision by Mining Corporation and Equipment Company, which prevents the granting of summary judgment.

Reversed and remanded for further proceedings consistent with this opinion.

BIRDSALL, P.J., and FERNANDEZ, J., concur.