In the

# United States Court of Appeals
### For the Seventh Circuit

---

Nos. 02-1432, 02-1469

MID AMERICA TITLE COMPANY,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

TRANSNATION TITLE INSURANCE COMPANY,

*Defendant-Appellant,*
*Cross-Appellee,*

and

LANDAMERICA FINANCIAL GROUP, INC.,

*Defendant,*
*Cross-Appellee.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 2060—**Suzanne B. Conlon**, *Judge.*

---

ARGUED DECEMBER 13, 2002—DECIDED JUNE 16, 2003

---

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* In this appeal Mid America Title Company, a title insurance agent, defends a jury verdict it obtained against Transnation Title Insurance

Company, a title insurance underwriter, in a diversity suit for breach of contract. Because we conclude that there was insufficient evidence for the jury to find that Transnation was the alter ego of its sibling corporations, we reverse the district court's judgment.

In 1983, Mid America contracted with Transnation (then known as Transamerica Title Insurance Company) to be its exclusive agent for issuing title insurance policies covering real property located in Chicago and surrounding areas. Under the agency agreement Transnation promised "not to issue, directly or indirectly, policies covering real property within the territory other than through ISSUING AGENT [i.e., Mid America]." In 1990, Transnation was acquired by Reliance Insurance Company, the parent company of Commonwealth Land Title Insurance Company, another title insurance underwriter that had long been operating in the Chicago market. Later, in 1998, a holding company called LandAmerica Financial Group, Inc. acquired both Transnation and Commonwealth. LandAmerica owned a third Chicago-area underwriter, Lawyers Title Insurance Corporation, and so the three underwriters—Transnation, Commonwealth, and Lawyers Title—became "siblings" under their common parent company, LandAmerica. Mid America, which was aware of the acquisitions, had renewed its contract with Transnation for a ten-year term in 1995. In 2001, however, Mid America sued both Transnation and LandAmerica for breaching the above-quoted contract provision. The jury found in favor of LandAmerica (which was not a party to the contract) but awarded $1.5 million against Transnation, which brought this appeal.

Mid America concedes that no Chicago-area policies were issued on Transnation paper, but the parties agree that Transnation's sibling underwriters—Commonwealth and Lawyers Title—continued to issue their own policies within Mid America's territory after the acquisitions.

Neither Commonwealth nor Lawyers Title was a party to the contract, but Mid America contends that their actions nonetheless constitute a breach of the contract by Transnation because the three underwriters, in Mid America's words, "commingled" their operations. The rule in Arizona, where Transnation is incorporated, is that corporations are legally separate entities whose acts are not imputed to their officers, shareholders, or affiliates. In rare cases Arizona courts will pierce the corporate veil and declare a corporation the alter ego of another entity, *see Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725, 729 (Ariz. 1991) (in banc), but mere common ownership is insufficient for piercing, *see, e.g.*, *Bischofshausen, Vasbinder, & Luckie v. D.W. Jaquays Mining & Equip. Contractors Co.*, 700 P.2d 902, 907 (Ariz. Ct. App. 1985). Instead, Arizona courts require a showing that the corporations share a "unity of control" and that observance of the corporate form would sanction a fraud or promote injustice. *See, e.g.*, *Taeger v. Catholic Family & Cmty. Servs.*, 995 P.2d 721, 733 (Ariz. Ct. App. 1999); *State v. Angelo*, 800 P.2d 11, 14 (Ariz. Ct. App. 1990). We view the additional evidence tending to show that the underwriters were commonly controlled in the light most favorable to Mid America.

First, there was evidence that the three underwriters had overlapping corporate officers: they shared the same president (Janet Alpert), senior vice president (J. Scott McCall), and vice president (William Perrine, who also was vice president of LandAmerica). Perrine also served as corporate secretary for Commonwealth and Transnation, and as assistant secretary for Lawyers Title. But this, too, is insufficient evidence of unity of control under Arizona law, *see Deutsche Credit Corp. v. Case Power & Equip. Co.*, 876 P.2d 1190, 1195 (Ariz. Ct. App. 1994); *Bischofshausen*, 700 P.2d at 907; *Jabczenski v. Southern Pac. Mem'l Hosps., Inc.*, 579 P.2d 53, 59 (Ariz. Ct. App. 1978), even when considered in combination with common

ownership, *see Horizon Res. Bethany Ltd. v. Cutco Indus., Inc.*, 881 P.2d 1177, 1180 (Ariz. Ct. App. 1994).

Second, the three underwriters consolidated their operations after the acquisitions. LandAmerica ran advertisements and sent letters to its agents explaining that its underwriters would henceforth "operate as one company" under the direction of a "unified management team" while continuing to "offer products and services under their own familiar names." The underwriters began sharing a downtown Chicago office as well as a number of employees, including a claims counsel, agency supervisor, regional manager, and two state agency managers. Two of those managers testified that they performed work for two or more of the underwriters but drew their salaries from only one. This operational streamlining also meant that the underwriters no longer dealt with each other at arm's length: Transnation, which in the past had required indemnification ("hold harmless") letters from the previous insurer before issuing a new title policy, ceased requiring such letters in cases where either Commonwealth or Lawyers Title was the prior insurer. At times the divisions between the underwriters seem to have been ignored entirely, as on the several occasions Mid America received correspondence pertaining to its agency relationship with Transnation that was signed by Commonwealth officials and written on Commonwealth letterhead. One such letter even addressed Mid America as an "agent" of Commonwealth, which it was not. Evidence also showed that LandAmerica's website referred users searching for Transnation agents to Commonwealth instead and that a Transnation office once referred a policy request it received to Lawyers Title.[1] (LandAmerica had

---

[1] A different clause of the agency agreement required Transnation to refer all "national real estate business" involving

(continued...)

a financial incentive to divert business from Transnation, which was bound by the agency agreement to issue Chicago-area policies only through—and thus share premiums with—its exclusive agent, Mid America. Lawyers Title was not so bound and could issue Chicago-area policies directly, resulting in greater profits.) An employee charged with insuring the profitability of all three underwriters, when asked how he decides "where business goes," testified that a policy request from an out-of-state Commonwealth or Lawyers Title office would "probably" be referred to the local office of the same underwriter.

Notably, however, much of the evidence Arizona courts typically rely on in piercing corporate veils is absent from this case. There is no evidence that any of the underwriters or holding companies were sham corporations formed to siphon off Transnation's (and thus Mid America's) business, *see Ize Nantan Bagowa, Ltd. v. Scalia*, 577 P.2d 725, 729-30 (Ariz. Ct. App. 1978) (party seeking to pierce must show financial setup of corporation is a sham; refusing to pierce where no evidence showed corporation was formed to defraud plaintiff); no evidence that any agents or policyholders were confused about which underwriter they dealt with, *cf. Gatecliff*, 821 P.2d at 729 (citing potential for customer confusion as an alter ego factor); and no evidence that the underwriters held themselves out to Mid America or anyone else as being one entity, rather than three closely related but separate entities, *cf. id.* (piercing where affiliated corporations used

---

[1] (...continued)
Chicago-area property to Mid America, and a separate count of Mid America's complaint charged that this referral constituted a breach of that clause. The district court granted judgment in favor of Transnation on that count, however, and Mid America has not appealed that ruling.

similar names). Finally, and perhaps most importantly, there is no evidence that the underwriters neglected any corporate formalities. *See Gatecliff*, 821 P.2d at 728; *Deutsche Credit*, 876 P.2d at 1195-96 (alter ego factors include whether corporation observes formalities of separate corporate existence such as maintaining corporate financial records, holding corporate meetings, and filing corporate income tax returns and annual reports with the Arizona Corporation Commission). On the contrary, the evidence was undisputed that each underwriter maintained separate accounting books, bank accounts, financial statements, and corporate records, held separate board meetings, and filed individual tax returns and reports with regulatory bodies. *Cf. Standage v. Standage*, 711 P.2d 612 (Ariz. Ct. App. 1985) (corporation that failed to file corporate tax returns and reports with ACC and failed to maintain corporate books and records was alter ego of its 50% owner and sole operator). Viewing the evidence as a whole, we do not think it is sufficient to show the degree of common control necessary to treat the underwriters as alter egos under Arizona law. *See, e.g.*, *Oldenburger v. Del E. Webb Dev. Co.*, 765 P.2d 531, 536 (Ariz. Ct. App. 1988) (refusing to pierce despite one corporation's ownership of and complete veto power over actions of another); *Bischofshausen*, 700 P.2d at 906-07 (refusing to pierce where one person was primarily responsible for controlling two corporations that shared an office, phone number, and two employees).

We note, moreover, that Mid America does little to address the second prong of the test, which requires a showing that veil-piercing is necessary to avoid fraud or injustice. *See, e.g.*, *Chapman v. Field*, 602 P.2d 481, 484 (Ariz. 1979) (in banc); *Deutsche Credit*, 876 P.2d at 1195. *Cf. Gatecliff*, 821 P.2d 729 (piercing to prevent denial of recovery to plaintiff whose health insurance was cancelled); *Standage*, 711 P.2d at 615 (piercing in divorce proceed-

ing where family-owned corporation held substantial portion of community property); *Cammon Consultants Corp. v. Day*, 889 P.2d 24, 232-33 (Ariz. Ct. App. 1994) (piercing sham corporation that property owner used to buy up tax liens on his own property). (Mid America insists that this case is "not about" veil-piercing, but it offers no other explanation how the acts of one corporate entity might be deemed a breach of contract by a separate entity.) Mid America makes no attempt to explain what tangible benefits stemmed from the exclusivity clause, which of course did not guarantee Mid America a certain percentage of the Chicago title insurance market but merely eliminated one source of competition (Transnation). But even a showing that Mid America was denied the benefit of its bargain would be insufficient to justify veil-piercing under Arizona law. *See Chapman*, 602 P.2d at 484; *Ferrarell v. Robinson*, 465 P.2d 610, 613 (Ariz. Ct. App. 1970).

Because there was insufficient evidence for the jury to have found that Transnation was the alter ego of either of the other underwriters, the district court's denial of Transnation's motion for judgment as a matter of law was error.

REVERSED.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*