579 P.2d 53

Felix F. JABCZENSKI, M. D., Max Baumeister, Jr., M. D., Milton Davis, Jr., M. D., Ruben Acosta, M. D., Jacob B. Redekop, M. D., Stanley S. Tanz, M. D., Donald L. Knutson, M. D., Hector L. Garcia, M. D., Gerrit Dangremond, M. D., John Does 1 through 10, M. D.s, Appellants,

v.

SOUTHERN PACIFIC MEMORIAL HOSPITALS, INC., A. B. McNabney, Helen B. McNabney, husband and wife, Vance M. Strange, M. D., Harold L. Upjohn, M. D., and Jane Doe Upjohn, husband and wife, Appellees.

No. 2 CA–CIV 2680.

Court of Appeals of Arizona, Division 2.

March 3, 1978.

Rehearings Denied April 14, 1978.

Reviews Denied May 9, 1978.

L. Tipton Jackson, Jr., Tucson, for appellants Jabczenski, Baumeister, Davis, Acosta, Redekop & Tanz.

Ettinger & Deckter, P. C. by Jack A. Ettinger and Louis L. Deckter, Tucson, for appellants Knutson, Garcia & Dangremond.

Joseph R. McDonald, P. C. by Joseph R. McDonald, Tucson, for appellees Southern Pac. Memorial Hospitals, Inc., McNabney & Strange.

Slutes, Browning, Zlaket & Sakrison, P. C. by D. Thompson Slutes, Tucson, for appellees Upjohn.

OPINION

HOWARD, Judge.

The appellants/plaintiffs bring this appeal to challenge a summary judgment in favor of appellees. In reviewing the granting of the summary judgment we shall view the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to appellants. *Poggi v. Kates,* 115 Ariz. 157, 564 P.2d 380 (1977).

Appellants are physicians who were employed by the Southern Pacific Employees Hospital Association (SPEHA), a non-profit corporation, to provide medical services for the members of SPEHA. SPEHA was organized to provide health care to Southern Pacific employees. It was a prepaid health plan which provided the doctors for the members of the plan. The appellants, as employees of SPEHA, had privileges at the Carl Hayden Hospital as at any other hospital. Most of the services were performed at Carl Hayden Hospital, but some of the services could be performed elsewhere in Tucson. The difference between SPEHA and companies like Blue Cross and Blue Shield was that SPEHA did not merely offer insurance, but actually delivered the health care through the doctors it hired.

The Southern Pacific Memorial Hospitals, Inc. (SPMHI), owned the Carl Hayden Hospital in Tucson, Arizona and also the Harkness Community Hospital in San Francisco. SPMHI provided the hospital facilities. It had a "capitation" agreement with SPEHA whereby SPMHI provided the hospital facilities to members of SPEHA for a certain amount per member per year.

Starting in 1967 appellants entered into agreements with SPEHA whereby a portion of their compensation was to be deferred until a later date. The agreements, which provided for specific monthly amounts to be paid to the doctor commencing at a future date, also had provisions as to termination of employment prior to the inception of payments. If the doctor's employment was terminated for certain specified wrongful conduct, neither he nor his beneficiaries were entitled to any payments. However, if the termination was for any other reason, prior to the inception of payments, the payments were to be made according to the tables attached to the agreement. The agreement contained no provisions as to how they were to be funded nor as to how much was to be deferred from the salary of the doctors in consideration of the payments provided for in the agreement.

In order to fund the agreement SPEHA purchased annuity contracts from an insurance company. Each contract named an individual doctor as the insured with SPEHA as the owner and beneficiary of the policy. Appellee McNabney was the business manager for SPEHA in charge of organizing the deferred compensation agreement. He was assisted in the project by appellee Vance M. Strange, the chief surgeon for SPEHA. McNabney was also the administrator of the hospital facilities for SPMHI.

Appellee Harold Upjohn came to California in 1970 at which time he formed two corporations, Health Maintenance, Inc. of Northern California (NorCal) and Health Maintenance Foundation (HMF), a non-profit corporation. HMF was organized to perform the same type of health services as was being provided by SPEHA. SPEHA was having financial difficulties so it entered into a service agreement with HMF by which HMF took over SPEHA's prepaid medical plan. To further this purpose SPEHA transferred to HMF all of its assets and HMF assumed all of SPEHA's liabilities. At the same time NorCal leased the Carl Hayden Hospital in Tucson and the Harkness Community Hospital in San Francisco from SPMHI. The assets of SPEHA consisted of dues paid by its members, and a substantial amount of cash was turned over to HMF in 1971. The insurance annuities which SPEHA had purchased to fund the deferred compensation plan were not initially assigned to HMF nor were the employment contracts between the doctors and SPEHA immediately transferred to HMF. The service agreement specifically set forth that as soon as the "complex" relationship between the physicians and SPEHA was

determined, HMF would have the right to have that relationship transferred to it. In the meantime, HMF agreed to fund SPEHA's deferred compensation plan.

In the spring of 1973 the lawyers for HMF informed SPEHA that unless the doctors and the annuities were transferred to HMF there was a substantial risk that the tax savings of the deferred compensation plan would be lost based upon certain internal revenue rulings. In essence, the lawyers were of the opinion that in order to avoid having the doctors immediately taxed on the deferred portion of their salary, it would be necessary for the doctors to be employees of the corporation which was providing the medical services under the prepaid plan. Then the employer as the owner, would be making the contributions and the amounts accrued would not be subject to the general creditors of the doctors.

SPEHA was reluctant to turn the annuity contracts over to HMF because there was a risk that mismanagement by HMF might jeopardize the contracts. However, it recognized that this same risk existed under SPEHA and when balanced against the possibility that the tax benefits of the plan might be lost, it transferred the annuity contracts to HMF and the doctors became employees of HMF.

The board of directors of HMF, after receiving the annuity contracts, decided that a greater rate of interest could be achieved by cashing the annuity contracts and placing the funds in certificates of deposit. It instructed its president to do so. The president, without the knowledge of the board members, including Dr. Upjohn as chairman of the board, cashed the policies but failed to place all the funds received into certificates of deposit. Instead, he spent $500,000 to meet the current operating expenses of HMF. Dr. Upjohn first learned of the president's actions at a board meeting held on October 8, 1974. When Dr. Upjohn and the other directors learned of the disposition of the funds by the president, the board ratified the expenditure. It then passed a resolution authorizing the president to expend the balance of the funds to meet current expenses. The resolution which authorized the expenditure stated that the funds received from the annuity contracts were assets of HMF which did not need to be separated from the general assets of HMF and that use of the funds to purchase medical services for its members would result in favorable public relations and new members.

When HMF took over SPEHA's prepaid plan it initially succeeded in changing a losing situation into a break-even situation. However, by late 1974, HMF was experiencing heavy losses because members of HMF demanded to be served locally rather than being sent to the Southern Pacific hospitals in distant cities such as Tucson and San Francisco. HMF filed a petition for reorganization under Chapter 11 of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. Appellants then filed this action.

The amended complaint cannot be considered as a shining example of pleading. Although one can deduce the existence of separate claims for relief, there are no separate counts pleaded. The gist of the amended complaint is that the appellees, SPEHA, SPMHI, McNabney and Strange secured money from appellants by telling them that the deferred compensation funds would be invested in insurance annuity contracts whereas in truth and fact it was all a scheme or plan by the appellees to secure the doctors' money so that it could be given to HMF for HMF's own wrongful use and benefit. The amended complaint seems to allege a breach of contract, fraud, an action for damages arising out of acts committed pursuant to a conspiracy, and conversion.

■ Appellees moved for summary judgment based upon the pleadings and depositions filed with the court. In opposition, appellants filed three affidavits. One is an affidavit of appellants' attorney wherein he states that he had spoken to all of the doctors and that they told him that McNabney represented to them that the funds in the deferred compensation would be held "in trust" and invested on their behalf. This affidavit, based upon hearsay, cannot be considered. Rule 56(e), Arizona Rules of

Civil Procedure. Appellants also presented the affidavits of Drs. Jabczenski and Knutson. Dr. Jabczenski's affidavit states in part:

"* * *

5. That defendants McNabney, as Business Manager of Association, and Strange, as Chief Surgeon of Association, orally represented the operation of said 'deferred compensation' program to affiant as follows:

a) that the specific monies deferred from affiant's periodic salary would be invested in life insurance annuity policies upon the life of affiant and for the affiant by the Association.

b) that the annuity policy purchased for the benefit of affiant was purchased with affiant's monies withheld from his periodic salary under the 'deferred compensation' program.

c) that the Association was merely holding affaint's (sic) deferred funds and the annuity policy for affiant's benefit.

6. That in reliance on these representations, affiant agreed to the terms of the 'deferred compensation' program and began to provide medical services for the Association."

Dr. Knutson states in his affidavit:

"* * *

5. That defendants McNabney, as Business Manager of the Association, and Strange, as Chief Surgeon for the Association orally represented the operation of said 'deferred compensation' program to affiant as follows:

a) that the association would withhold from affiant's periodic salary, the sum of ONE HUNDRED ($100.00) DOLLARS per month for a period of time for the purpose of investing this sum in an insurance annuity contract on the life of affiant and for the benefit of affiant.

b) that at some specified time thereafter, the Association would withhold the sum of NINE HUNDRED ($900.00) DOLLARS per month for the same purpose, i.e., to use said funds to invest in an annuity contract for the benefit of affiant.

c) that if affiant remained in the employ of the Association for the periods of time specified in the deferred compensation agreement, affiant's funds invested in the annuities would be paid to affiant in the form of specified monthly payments for the remainder of affiant's life.

6. That in reliance on these representations, affiant agreed to the terms of the 'deferred compensation' program and continued to provide medical services for the Association."

After taking the matter under advisement the court granted summary judgment in favor of appellees.

■ Two prerequisites must be met before entry of summary judgment is appropriate: (1) The record before the court must show that there is no genuine dispute as to any material fact and that only one inference can be drawn from those undisputed material facts and (2) based on the undisputed material facts, the moving party must be entitled to judgment as a matter of law. *Dutch Inns of America, Inc. v. Horizon Corporation,* 18 Ariz.App. 116, 500 P.2d 901 (1972). If there is the slightest doubt as to whether there is an issue of fact in ruling on the motion for summary judgment, such doubt should be resolved in favor of a trial on the merits. *O'Brien v. Scottsdale Discount Corporation,* 14 Ariz. App. 224, 482 P.2d 473 (1971).

Appellants contend that the record discloses a factual dispute as to (1) whether the deferred compensation funds were to be held in trust; (2) whether appellees McNabney and Strange made misrepresentations as to the plan; and (3) whether the corporateness of SPMHI and SPEHA should be disregarded.

### EVIDENCE OF A TRUST

■ The essential elements of a trust are: a) a competent settlor and a trustee; b) a clear and unequivocal intent to create a trust; c) an ascertainable trust res; and d) sufficiently identifiable beneficiaries. *Lane Title & Trust Co. v. Brannan,* 103 Ariz. 272, 440 P.2d 105 (1968).

**20**

We believe the affidavits of Drs. Jabczenski and Knutson raise an issue as to whether a trust was created. Furthermore, McNabney admitted in his deposition that he and Dr. Strange told the doctors that deferred compensation funds would be used to purchase annuity contracts in the name of SPEHA for the benefit of the doctors. The parol evidence rule does not preclude the use of this testimony. There is nothing in the deferred compensation agreement which expressly fixes beneficial title in SPEHA or negates a trust. Indeed, the deferred compensation agreements contain no provisions as to how much was to be deferred from each doctor's salary or how the funds were to be held. Where the written instrument is silent, extrinsic evidence of a trust may be admitted. *Carrillo v. Taylor,* 81 Ariz. 14, 299 P.2d 188 (1956); Restatement (Second) of Trusts, § 38(3).

If the deferred compensation funds were held in trust, the liability of Dr. Upjohn, as a director of the corporation to whom the annuity contracts were assigned takes on a new dimension because their disposition by HMF would have amounted to a conversion. The question then becomes whether Dr. Upjohn can become personally liable for the conversion of the funds. We believe he can. Corporate directors are not personally liable for conversion committed by the corporation or one of its officers merely by virtue of the office they hold. To be held liable, the directors must participate or have knowledge amounting to acquiescence or be guilty of negligence in the management and supervision of the corporate affairs causing or contributing to the injury. *Tillman v. Wheaton-Haven Recreation Association, Inc.,* 517 F.2d 1141 (4th Cir. 1975); *Taylor v. Alston,* 79 N.M. 643, 447 P.2d 523 (1968); Annot., 152 A.L.R. 696, 712 (1944); 3 Fletcher, Cyclopedia of the Law of Private Corporations, §§ 1137, 1140, (rev.perm.ed. 1975). A director who actually votes for the commission of a tort is personally liable, even though the wrongful act is performed in the name of the corporation. *Tedrow v. Deskin,* 265 Md. 546, 290 A.2d 799, 802 (1972); see, 3 Fletcher, Cyclopedia of the Law of Private Corpora-

tions, §§ 1135, 1137, (rev.perm.ed. 1975); *Tillman v. Wheaton-Haven Recreation Association, Inc., supra.* Good intentions are no defense to a conversion. As stated in the case of *Poggi v. Scott,* 167 Cal. 372, 139 P. 815, 51 L.R.A.,N.S., 925 (1914):

" . . . The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action. 'The plaintiff's right of redress no longer depends upon his showing, in any way, that the defendant did the act in question from wrongful motives, or, generally speaking, even intentionally; and hence the want of such motives or of intention, is no defense. Nor, indeed, is negligence any necessary part of the case. Here, then, is a class of cases in which the tort consists in the breach of what may be called an absolute duty; the act itself (in some cases it must have caused damage) is unlawful and redressable as a tort. [citation omitted] And says Judge Cooley (*Cubit v. O'Dett,* 51 Mich. 347, 16 N.W. 679): 'Absence of bad faith shall never excuse a trespass, though the existence of bad faith may sometimes aggravate it. Everyone must be sure of his legal right when he invades the possession of another.'" 139 P. at 816.

Therefore, with specific reference to the conversion of funds in the possession of a corporation, an officer thereof can be personally liable for any act which constitutes a conversion of a third person's property even though the act may be done on behalf of the corporation and such liability for conversion does not rest upon the knowledge or intent of the defendant. *Preston-Thomas Construction, Inc. v. Central Leasing Corporation,* 518 P.2d 1125 (Okl.App. 1974). See also, 18 Am.Jur.2d Conversion § 127. And see, *Gila Water Company v. Gila Land & Cattle Company,* 30 Ariz. 569, 249 P. 751 (1926).

■ The trial court erred in granting summary judgment in favor of Dr. Upjohn.

## THE ALLEGED MISREPRESENTATIONS OF McNABNEY AND STRANGE

■ Appellees McNabney and Strange contend the record discloses that there can be no fraud on their part since their representations were true. We do not agree. We believe it can be inferred from the record that McNabney and Strange told the doctors that the insurance annuity contracts would be placed in the doctors' names with the doctors as the beneficiaries and with SPEHA merely holding the policies as a trustee. It can further be inferred that Drs. McNabney and Strange either knew this was untrue or, that at the time of the representations, they had no intention of making the doctors the owners or beneficiaries of the annuity contracts. Under such circumstances the granting of summary judgment was improper as to McNabney and Strange.

## DISREGARDING CORPORATENESS

■ Appellants contend that SPMHI and SPEHA should be considered as one corporation. They base this contention on the fact that they had some common directors and officers. The record also shows that they held one or two joint meetings. We do not agree with appellants. SPMHI was a corporation for profit. SPEHA was not. Each was incorporated for a specific legitimate purpose. SPEHA owned no stock in SPMHI. They were not subsidiary of affiliated corporations.[1] Mere interlocking directorates or like evidence of close association will not justify disregarding corporate identities. *Pittsburgh Reflector Co. v. Dwyer & Rhodes Co., Inc.,* 173 Wash. 552, 23 P.2d 1114 (1933). In order to justify judicial disregard of corporate identities, one of two things, at least, must clearly appear. Either the dominant corporation must so control and use the other as a mere tool or instrument in carrying out its own

plans and purposes that justice requires it be held liable for the results, or, there must be such a confusion of identities and acts as to work a fraud upon third persons. Neither element appears here.

■ Appellants argue that they did not have enough time to fully explore the relationship between the two companies and that the granting of this "quickie" summary judgment was improper. We do not agree. Appellants did not complain of their inability to complete discovery until after the trial court had ruled against them. Appellees waited nine months after the last deposition before filing their motions for summary judgment. The amended complaint was filed on June 20, 1975. The motion for summary judgment by SPMHI and SPEHA was not filed until August of 1976. The trial court did not abuse its discretion in denying appellants' motion to rehear the summary judgment on the grounds that they had not had an adequate opportunity to complete their discovery.

The judgment is affirmed as to Southern Pacific Memorial Hospitals, Inc. The judgment in favor of A. B. McNabney, Helen B. McNabney, husband and wife, Vance M. Strange, M. D., Harold L. Upjohn, M. D. and "Jane Doe" Upjohn, husband and wife, and against appellants is reversed and remanded for further proceedings.

HATHAWAY, J., and J. RICHARD HANNAH, Superior Court Judge, concur.

NOTE: RICHMOND, C. J., having requested that he be relieved from consideration of this matter, J. RICHARD HANNAH, Superior Court Judge, was called to sit in his stead and participate in the determination of this decision.

1. As to when corporateness will be disregarded in the case of subsidiary or other affiliated corporations see, Henn, Law of Corporations, 2nd Ed. § 148 (1970).