A separate judgment in accordance with this memorandum and order is entered this same date.

Grace KEAMS, et al., Plaintiffs,

v.

TEMPE TECHNICAL INSTITUTE, INC., et al., Defendants.

CIV. No. 91–0728 PHX ROS.

United States District Court, D. Arizona.

Dec. 15, 1997.

Bruce A. Burke, O'Dowd, Burke & Lundquist, P.C., Erik M. O'Dowd, Tucson, AZ, for Grace Keams, Jolene Cordero and Bunny McCorkey.

Jeffrey G. Williams, Jeffrey G. Williams PC, Mesa, AZ, for Carl E. Forsberg and C. Colleen Forsberg.

Ed Nabors, Mesa, AZ, pro se.

Martha Nabors, Mesa, AZ, pro se.

P. Bruce Converse, Gary L. Birnbaum, Michael P. West, Kathryn A. Krecke, Mariscal Weeks McIntyre & Friedlander PA, Phoenix, AZ, for Zions First National Bank.

Stephen E. Richman, Christopher Robbins, O'Connor Cavanagh Anderson, Westover Killingsworth & Beshears, Phoenix, AZ, for Student Loan Marketing Ass'n.

Richard A. Segal, Gust Rosenfeld PLC, Phoenix, AZ, Elizabeth Ann Faulkner, K.H. Hunnicutt & Associates, Tempe, AZ, for United Student Aid Funds, Inc.

David C. Tierney, Sacks Tierney & Kasen PA, Phoenix, AZ, for Accrediting Bureau of Health Education Schools/Programs.

Joseph Dean Romley, Michael J. Farrell, Jennings Strouss & Salmon PLC, Phoenix, AZ, David L. White, White Cummings & Longino PC, Phoenix, AZ, for National Ass'n of Trade and Technical Schools.

## ORDER

SILVER, District Judge.

Pending before the Court are (1) Defendant Zions First National Bank's Motion for Summary Judgment, which has been joined by Defendant Student Loan Marketing Association, and (2) Defendants Carl Forsberg and C. Colleen Forsberg's Motion for Summary Judgment.

## *BACKGROUND*

Plaintiffs are a class of former students at Tempe Technical Institute ("TTI"), a for-profit vocational school that operated from September, 1988 to April, 1990. Defendant Carl Forsberg owned TTI and served as its President; C. Colleen Forsberg, his wife, was the corporation's Secretary. Defendant Zions National Bank ("Zions") issued many of the federal student loans obtained by the Plaintiffs in order to finance their education at TTI. Defendant Student Loan Marketing Corporation ("Sallie Mae") purchased Plaintiffs' student loans from Zions.

TTI was incorporated in 1988 by Carl Forsberg, a former employee and part-owner of the Phoenix Institute of Technology, another Phoenix vocational school. TTI purchased the assets of the Southwestern Medical Society Academy, an accredited vocational school specializing in the training of nonphysician medical personnel, and renamed the school. The school continued to offer medical training and expanded its offerings to include courses in drafting, computers, and automotive technology. TTI was in financial trouble for most of its short life due to Carl Forsberg's inability to obtain sufficient financing to operate the school. Upon discovering financial irregularities, a guaranty agency withdrew its accreditation of TTI in March, 1990. TTI soon closed, and later that year both TTI and the Forsbergs filed for bankruptcy pursuant to Chapter 7 of the United States Bankruptcy Code.

Plaintiffs, who are primarily Native Americans, claim that they were recruited from Northern Arizona and New Mexico to attend school in Phoenix and Tempe with promises of practical training, financial aid, guaranteed housing, and job placement assistance. The former students contend that after taking out student loans they discovered that the school was "a sham, incapable financially, administratively and qualitatively of providing the services it marketed." (Pls. Resp. at 25.) Plaintiffs contend that TTI provided an inferior education, failed to provide housing, and did not assist them with job placement.

Plaintiffs commenced this action in the Superior Court of Maricopa County, and it was removed to this Court on May 8, 1991. Plaintiffs' Amended Complaint and Responses[1] allege that Defendant Zions is directly liable to Plaintiffs for breaching duties imposed by Arizona law, and vicariously liable because TTI was acting as an agent for Zions when it injured the Plaintiffs. Plaintiffs also claim that Defendant Sallie Mae is vicariously liable for Zions' misdeeds. On April 18, 1997, Zions moved for summary judgment on all counts. On the same day, Sallie Mae joined Zions' Motion. Plaintiffs also seek to hold Defendants Carl and Colleen Forsberg personally liable for the TTI's wrongdoing under state law. On April 18, 1997, the Forsbergs moved for summary judgment on all counts, arguing that they are entitled to prevail based on state law and federal bankruptcy law. On April 25, 1997, Plaintiffs filed Responses to both Motions. On September 19, 1997, Zions and the Forsbergs filed their Replies.

## *LEGAL STANDARD*

A motion for summary judgment may be granted if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To defeat the motion, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

---

1. In their Responses to both Motions for Summary Judgment, Plaintiffs indicate that they have abandoned some of their claims against the parties.

If the non-moving party will bear the burden of proof at trial as to any element essential to its case, that party can withstand a motion for summary judgment only by making a showing sufficient to establish a genuine issue of fact regarding that element and showing that the dispute properly may be resolved only by the fact finder because it could reasonably be resolved in favor of either party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Courts must view the evidence in the light most favorable to the nonmoving party and draw any reasonable inferences in the nonmoving party's favor. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

## MOTION OF ZIONS

### 1. Ratification

■ Plaintiffs first contend that Zions is liable for TTI's alleged wrongdoings because Zions designated TTI as its agent by ratifying its actions.[2] Ratification creates an agency relationship where "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Restatement (Second) of Agency § 82 (1958); *see also Fuqua Homes, Inc. v. Grosvenor,* 116 Ariz. 424, 569 P.2d 854, 856 (App.1977) (explaining the concept of ratification). Plaintiffs assert that the act at issue was the assistance that TTI gave to students by providing them with student loan applications and by helping the students complete the forms. Zions then "affirmed" this act by processing the applications and issuing the loans. According to Plaintiffs, because Zions realized the benefits associated with processing the loans, it also "assumed responsibility for the concomitant burdens and liabilities as it would have for any authorized agent's act." (Pls. Resp. at 13.) In its Motion for Summary Judgment, Zions argues that its actions in extending student loans to Plaintiffs did not constitute an affirmance of any of TTI's actions.

2. This claim is not in Plaintiffs' Amended Complaint and is raised for the first time in their

■ The Restatement is clear that "[r]atification does not result from the affirmance of a transaction with a third person unless the one acting purported to be acting for the ratifier." *Restatement (Second) of Agency* § 85(1). In order for Plaintiffs to sustain a ratification theory of agency, they must show that TTI purported to act for Zions. The allegations of Plaintiffs show only that TTI made representations to the contrary. According to Plaintiffs, they "only dealt with and relied on school personnel as the source of [the] student loans," "TTI certainly held itself out to borrowers as the source of tuition and subsistence funds," and TTI "did not distinguish itself from the bank." (Pls. Resp. at 12–13.) These statements support the conclusion that TTI was acting for itself, not purporting to act for Zions.

Plaintiffs note that a comment in the Restatement provides that "an unauthorized agent need not expressly hold himself out as the principal's agent; it is enough that he undertakes a transaction for the other." (Pls. Resp. at 11); *see Restatement (Second) of Agency* § 85, cmt. e ("A person purports to act on account of another if he undertakes to act on his behalf and to make the other a party to the transaction. . . ."). The accepted majority view, however, is that the purported agent must disclose to the third party that he is acting as an agent. Harold Gill Reuschlein & William A. Gregory, *The Law of Agency and Partnership* § 28–29 at 73 (2d ed.1990). This view also prevails in Arizona, where the ratification can occur only when someone is "claiming to act as an agent." *Fuqua Homes,* 569 P.2d at 856 (citing *Phoenix Western Holding Corp. v. Gleeson,* 18 Ariz. App. 60, 500 P.2d 320 (App.1972)); *Young Mines Co. v. Citizens' State Bank,* 37 Ariz. 521, 296 P. 247, 250 (1931) ("A ratification is the subsequent approval by a principal of a previous unauthorized act by one claiming to act as an agent. . . ."). Evidence provided by Plaintiffs shows that TTI claimed that it did not act as an agent. Accordingly, there can be no genuine issue of material fact that this essential element of ratification is present.

Response. The Court will nonetheless consider the merits of this argument.

### 2. Duty of Care

 "An action in negligence may be maintained upon the plaintiff's showing that the defendant owed a duty to him, that the duty was breached, and that the breach proximately caused an injury which resulted in actual damages." *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 945 P.2d 317, 339 (App.1996) (quoting *Ontiveros v. Borak*, 136 Ariz. 500, 667 P.2d 200 (1983)). Plaintiffs argue that the common law of torts imposes a duty of care on lenders of student loans and that Zions breached that duty of care by making student loans to Plaintiffs. According to Plaintiffs, banks owe this duty in the area of consumer lending when "there is evidence of a continuing business relationship or the existence of a special relationship between lender and borrower." (Pls. Resp. at 17–18.) Indeed, when "a confidential relationship in regard to financial matters does exist" between a bank and its customer, "the bank is subject to the rules applying to confidential relations in general." *Stewart v. Phoenix National Bank*, 49 Ariz. 34, 64 P.2d 101, 106 (1937). Plaintiffs assert that such a relationship existed between Zions and the Plaintiffs, arguing that Zions entered into an "enabling relationship" with TTI despite its lack of knowledge about the school, and that the students were rushed through enrollment by the school. (Pls. Resp. at 20–21.) Even if true, however, these allegations do not support the existence of a special relationship between Zions and the Plaintiffs. This evidence might establish a relationship between Zions and TTI, or between TTI and the Plaintiffs, but not Zions and the Plaintiffs. Plaintiffs' claim fails under its own standard, as they have not identified any evidence that could demonstrate the existence of a special relationship with Zions.

 Plaintiffs also contend that banks owe borrowers a general duty of reasonable care in processing loan applications. The Arizona courts have not directly addressed this issue, but some courts in other jurisdictions have determined that a bank owes its customers a duty of reasonable care in processing loan applications. *Jacques v. First National Bank of Maryland*, 307 Md. 527, 515 A.2d 756 (1986); *Walters v. First National Bank of Newark*, 69 Ohio St.2d 677, 433 N.E.2d 608 (1982). In *Jacques,* the court found the existence of a confidential relationship, and in *Walters,* a bank official informed the plaintiff that she had insurance when in fact she did not. These holdings do not address the issue of whether the bank has a duty to evaluate the purposes for which the borrower intends to use the loan. *See Jacques,* 515 A.2d at 762 ("The case before us is factually distinguishable from those in which a prospective customer simply submits an application for a loan. . . ."). When courts have considered this precise issue, they have held that "a lender has no duty to disclose its knowledge that the borrower's intended use of the loan proceeds represents an unsafe investment." *Nymark v. Heart Federal Sav. & Loan Assoc.*, 231 Cal.App.3d 1089, 283 Cal.Rptr. 53, 57 (1991) (citing *Wagner v. Benson*, 101 Cal. App.3d 27, 161 Cal.Rptr. 516 (1980)); *see also Ulrich v. Federal Land Bank of St. Paul*, 192 Mich.App. 194, 480 N.W.2d 910, 913 (1991) (bank "had no independent legal duty to exercise reasonable care in determining plaintiffs' eligibility for a loan"). Given the lack of authority for Plaintiffs' position, there is no basis for concluding that the Arizona courts would impose such a duty on Zions.

 Plaintiffs also contend that Zions voluntarily assumed a duty of care and then breached it, citing an Alabama case for the proposition that once the bank "voluntarily agreed to assist the [borrowers], it was required to act with due care." *First Federal Sav. & Loan Assoc. of Hamilton v. Caudle*, 425 So.2d 1050, 1052 (Ala.1982). According to Plaintiffs, Zions voluntarily assumed a duty questioning TTI about loan default rates among its students. In response, a TTI employee informed Zions that the school was too new to have a default rate, yet the truth was that TTI had a default rate of 22.96%. (Pls. Resp. at 22.) Plaintiffs argue that by inquiring about default rates but then accepting TTI's answer at face value, Zions assumed and then breached "a due diligence function." It is far from clear, however, that this inquiry is equivalent to assuming a duty of care. Within the context of *Caudle*, a duty does not arise until the bank agrees to assist the borrowers, and Plaintiffs have not alleged

or provided evidence to support a conclusion that this inquiry was intended to assist the Plaintiffs.

■ Plaintiffs also bring forth an expert witness, Dr. James McNulty, to aid the jury in determining the duty and applicable standard of care. (Pls. Resp. at 22.) As a matter of Arizona law, the issue of duty is determined by the court. *Hamman v. County of Maricopa,* 161 Ariz. 58, 775 P.2d 1122, 1125 (1989). Because the legal conclusions of an expert are inadmissible, the testimony of an expert witness, standing alone, cannot create a duty. 4 *Weinstein's Federal Evidence* § 702.04[12] at 702–27 (2nd ed.1997); *see also Hafner v. Beck,* 185 Ariz. 389, 916 P.2d 1105, 1109 (App.1995) (an "expert witness cannot create a duty through his opinions and beliefs, when the law does not recognize any such duty"). Plaintiffs have not established that Zions had a duty to Plaintiffs, and expert testimony alone will not help them do so.

■ Zions also questions Dr. McNulty's qualifications as an expert witness, pointing out that, by his own admission, he has no knowledge or experience relating to the federal student loan program. The Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), set forth a methodology to evaluate the admissibility of scientific expert testimony under Rule 702 of the Federal Rules of Evidence. Although the Ninth Circuit has limited *Daubert* to the admission of scientific testimony, it teaches a general lesson that "in ruling on admissibility, trial judges are the gatekeepers and should pay particular attention to the reliability of the expert and his or her testimony." *McKendall v. Crown Control Corp.,* 122 F.3d 803, 806 n. 1 (9th Cir.1997). This lesson "applies to all expert testimony." *Id.* As gatekeeper, the Court is obliged to exclude all expert witnesses who lack the necessary "knowledge, skill, experience, training, or education." Fed.R.Evid.

702. While the Court has already determined that Dr. McNulty's testimony alone cannot create a legal duty, his expert status would not survive the close scrutiny demanded by Rule 702.

■ Lastly, Dr. McNulty's testimony appears to be irrelevant to the issue of whether Zions had a duty to the Plaintiffs. According to Dr. McNulty, Zions' failure to perform due diligence requirements such as evaluating the credit history of the borrowers or evaluating whether the student would be able to repay the loan represents a violation of standard of care for the lender. (Pls. SOF Opp. Def. Mot. ¶¶ 59–64.) This does not establish a duty of care to the Plaintiffs. The duty to engage in prudent banking practices does not exist for the benefit of potential borrowers, but rather for those who have an interest in the financial security of the bank, such as the bank's stockholders. Thus, even if Zions violated the duty to engage in prudent banking practices, this breach does not create liability to the Plaintiffs, to whom they owed no duty. *Prosser & Keaton on Torts* § 53 at 358 (5th ed.1984) (scope of duty).

Plaintiffs also argue that the Higher Education Act (HEA) incorporates state common law due diligence duties, and that Zions has violated the HEA by violating these state duties. Because the Court has found that Zions has not breached any state law duty to Plaintiffs, it need not reach the issue of whether the HEA incorporates state law. Similarly, the Court need not reach the issue of whether Plaintiffs' recovery in tort would be barred by the "economic loss rule." [3]

### 3. FTC Holder Rule

The FTC Holder Rule is a federal regulation requiring sellers to include in consumer credit contracts a notice that preserves a debtor's claims and defenses against subsequent holders of the note. 16 C.F.R. § 433.2 (1997).[4] This notice was not included in the

---

**3.** *See Salt River Project Agr. Imp. & Power Dist. v. Westinghouse Electric Corp.,* 143 Ariz. 368, 694 P.2d 198, 209 (1984) ("Where economic loss ... is the plaintiff's only loss, the policies of the law generally will be best served by leaving the parties to their commercial remedies.").

**4.** The language of the notice is as follows: NOTICE: ANY HOLDER OF THIS CONSUMER

Plaintiffs' student loan contracts, but they argue that this Court should impute these terms into the contracts as a matter of state law. If the Court implies these terms into the contract, Plaintiffs may be able to assert its claims and defenses arising from TTI's behavior against Zions as well.

 In support of this proposition, Plaintiffs point out that "Arizona courts have long held that by operation of law a statute enacted for the protection of the public are [sic] 'a part of every contract.'" (Pls. Resp. at 31) (citing *Yeazell v. Copins*, 98 Ariz. 109, 402 P.2d 541 (1965)). As Zions points out, however, the complete quotation from *Yeazell* provides that *"the laws of the state* are a part of every contract." *Id.* 402 P.2d at 544 (emphasis added). It is not true that every federal statute is automatically a part of every private contract. Plaintiffs also cite to a case upholding a private right of action pursuant to the state Consumer Loan Act. *Transamerica Financial Corp. v. Superior Court,* 158 Ariz. 115, 761 P.2d 1019, 1021 (1988). This case simply does not address the question of whether a federal statute is implied into a contract as a matter of state law. Moreover, it is clear that the FTC Holder Rule does not provide a private right of action under federal law. *Bartels v. Alabama Commercial College,* 918 F.Supp. 1565, 1570 (S.D.Ga.1995).

It is noteworthy that other courts that have previously considered this issue have refused to read this federal regulation into state law. *See, e.g., Jackson v. Culinary School of Washington,* 27 F.3d 573, 582 (D.C.Cir.1994) (declining to reach state law issue); *Williams v. National School of Health Technology,* 836 F.Supp. 273, 283 (E.D.Pa.1993) (rejecting liability under state law). The Plaintiff has not provided any authority to support this interpretation of Arizona law, and the Court has been unable to find any. Accordingly, this Court will not imply the terms of the FTC Holder Rule into the contracts as a matter of state law.

CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH

### MOTION OF SALLIE MAE

Sallie Mae has moved for summary judgment on Plaintiffs claims against it by joining in Zions' Motion for Summary Judgment. Both Sallie Mae and Plaintiffs agree that the claims against Sallie Mae consist only of derivative claims stemming from Zions' liability. Plaintiffs' claims against Zions, however, have not survived Zions' Motion for Summary Judgement. Accordingly, the Court will grant Sallie Mae's Motion as well.

### MOTION OF THE FORSBERGS

Carl and Colleen Forsberg have moved for summary judgment on all counts alleged against them by the Plaintiffs, arguing that Plaintiffs have not raised a genuine issue of material fact that (1) the Forsbergs are liable under state law, and that (2) the claims against the Forsbergs are not dischargeable under Chapter 7 of the Bankruptcy Code. In their Response, Plaintiffs concede that the claims are dischargeable except for Count One (common law fraud), Count Two (consumer fraud), and Count Four (state racketeering).

#### 1. The Bankruptcy Code

 11 U.S.C. § 727(a) directs the court to grant the debtor a discharge under a Chapter 7 bankruptcy, and § 727(b) provides, in part, that "[e]xcept as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter." Section 523, in turn, disallows a discharge "to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). The Ninth Circuit has developed a five-factor test to determine whether a debt is nondischargeable under § 523(a)(2)(A). The creditor must show that:

(1) the debtor made the representations;

(2) that at the time he knew they were false;

THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR.

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations;

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*Britton v. Price (In re Britton),* 950 F.2d 602, 604 (9th Cir.1991).

Both Plaintiffs' Amended Complaint and their Response to the Motion for Summary Judgment conspicuously omit allegations that the Forsbergs made false representations to the Plaintiffs. Instead, Plaintiffs maintain that Carl Forsberg misled Valley National Bank and the State Board, and that Ed Nabors, a recruiter for TTI, misled the Plaintiffs. (Pls. Resp. at 6–21.) The Ninth Circuit's five-factor test for barring discharge of debts under § 523(a)(2)(A), articulated in *Britton*, requires that the debtor make intentional misrepresentations with the intention of misleading the creditor, and that the creditor rely on these representations. Plaintiffs have not alleged that the Forsbergs made statements to Valley National Bank or the State Board with the intention of deceiving Plaintiffs or that the Plaintiffs relied on these statements. Accordingly, the Court cannot consider these statements for the purpose of barring discharge of debts pursuant to § 523(a)(2)(A). The Plaintiffs have, however, asserted that Ed Nabors intentionally misrepresented TTI and that they relied on those misrepresentations.

The Court will first consider whether the Plaintiffs have demonstrated the existence of a genuine issue of material fact that the Forsbergs are liable under state law for the corporate actions of TTI or for the individual actions of Ed Nabors. If so, the next step is to examine whether there is a genuine issue of material fact that debts arising from Plaintiffs' claims are not barred from discharge under the Bankruptcy Act. If there is, the Court will then determine whether the Plaintiffs' state law claims against the Forsbergs survive this Motion for Summary Judgment.

## 2. State Law Bases of Liability

Plaintiffs base their argument that the Forsbergs are personally liable for their injuries on two theories: piercing of the corporate veil and liability for corporate torts.

### a. Piercing the Corporate Veil

First, Plaintiffs urge the Court to pierce the corporate veil of TTI and to hold the Forsbergs individually responsible for its liabilities. The general rule is that corporate status will not be lightly disregarded. *Chapman v. Field,* 124 Ariz. 100, 602 P.2d 481, 483 (1979). However, Arizona courts will pierce a corporate veil and impose personal liability if the business is conducted on a personal rather than a corporate basis, and if the business was established without an adequate financial basis. *Ize Nantan Bagowa, Ltd. v. Scalia,* 118 Ariz. 439, 577 P.2d 725, 728 (App. 1978). Plaintiffs allege that both these factors are present in the case of TTI, maintaining that the Forsbergs operated TTI on a personal basis and that it was undercapitalized from its inception. If Plaintiffs succeed in piercing TTI's corporate veil, then the Forsbergs will be held responsible for the liabilities of TTI. If these liabilities arise from frauds perpetrated by TTI, the Forsbergs may not discharge them under § 523(a)(2)(A). *Calgagno v. Ezell,* 112 B.R. 146, 148 (E.D.La.1990).

In support of the first factor, Plaintiffs argue that the Forsbergs commingled funds, failed to observe corporate formalities, and diverted corporate funds for personal needs. Plaintiffs make two general factual claims in connection with these allegations: that Colleen Forsberg held the title of Secretary of the corporation but did not actually perform any corporate duties, and that corporate funds paid for the Forsbergs' personal needs. Plaintiffs argue that given Colleen Forsberg's failure to perform official functions, "it is safe to conclude that there were no formal meetings and no minutes made of those meetings." (Pls. Resp. at 23.) Even if true, the lack of corporate formalities is not sufficient, standing alone, to pierce the corporate veil under Arizona law. *Bischofshausen, Vasbinder, and Luckie v. D.W. Jaquays Mining & Equip. Contractors Co.,* 145 Ariz. 204, 700 P.2d 902, 907 (App.1985) ("The facts show no more than that the corpora-

tions were run in same informal manner as is usually seen in closely held corporations."); *see also Chapman v. Field,* 124 Ariz. 100, 602 P.2d 481, 484 (1979) (rejecting piercing of veil for failure to file annual reports and keep proper records). Plaintiffs also claim that the Forsbergs used corporate funds for personal expenses and that personal assets were combined with corporate assets. The evidence submitted by the Plaintiffs, however, shows only that the Forsbergs irregularly withdrew money for personal expenses in lieu of a salary. (Pls. SOF in Opp. to Forsberg Motion ¶ 60.) This does not establish an intermingling of personal and corporate assets or disrespect of the corporate form, and does not support a conclusion that "there is such unity of interest and ownership that the separate personalities of the corporation and owners ceased to exist." *Dietel v. Day,* 16 Ariz.App. 206, 492 P.2d 455, 457 (1972).

 Plaintiffs also argue that TTI's corporate veil should be pierced because it has been undercapitalized from its inception. Under Arizona law, undercapitalization of a corporation is an "important factor" in determining whether to pierce the corporate veil, but not an absolute ground in the absence of fraud or injustice to the aggrieved parties. *Ize Nantan Bagowa,* 577 P.2d at 729. Those seeking to pierce the corporate veil must show that "the financial setup of the corporation is only a sham and causes an injustice." *Id.* The capitalization of a corporation is evaluated at the time that it is established. *Norris Chemical Co. v. Ingram,* 139 Ariz. 544, 679 P.2d 567, 570 (App.1984).

The Forsbergs formed TTI's corporate structure to purchase the assets of the Southwestern Medical Society Academy. Plaintiffs point to Carl Forsberg's deposition testimony, in which he estimates that he needed $500,000 to purchase the school and to give it a "cash infusion" to remedy a negative cash flow. (Pls.App. Tab 1 at 58–59.) Of this $500,000, the purchase price accounted for $370,000. The Forsbergs made a down payment of $100,000 on the purchase price upon assuming ownership, and planned to pay the remainder of the purchase price and to contribute capital to TTI upon receiving an anticipated sum of $3 million from a

previous business venture. According to Forsberg, however, approximately 30–60 days after the purchase of the school it became clear that receiving the money would be difficult.

 While the unavailability of this capital undoubtedly harmed the enterprise, it does not demonstrate that "the financial setup of the corporation is only a sham." *Ize Nantan Bagowa,* 577 P.2d at 729. Arizona courts require more than mere unprofitability for an enterprise to be considered undercapitalized; the amount of capital must be "illusory or trifling." *Norris Chemical,* 679 P.2d at 570 (quoting *Fletcher's Cyclopedia of the Law of Private Corporations* § 44.1); *see also* Harvey Gelb, *Piercing the Corporate Veil: The Undercapitalization Factor,* 59 Chi.-Kent L.Rev. 1, 14 (1982) (noting the requirement that "undercapitalization must be 'obvious' or 'gross' or the capital 'trifling'"). Given that the TTI's assets at the time of incorporation consisted of an existing and functioning school, they cannot be characterized as illusory or trifling and this enterprise cannot be considered undercapitalized by the standards developed by the Arizona courts.

*2. Personal Liability for Corporate Torts*

As an alternative ground, Plaintiffs argue that the Forsbergs are liable for torts committed by Ed Nabors, one of TTI's recruiters, as a result of their actions taken as directors of the corporation. Under Arizona law, corporate directors are not personally liable for torts committed by the corporation simply by virtue of their office. *Jabczenski v. Southern Pacific Memorial Hospitals, Inc.,* 119 Ariz. 15, 579 P.2d 53, 58 (App.1978). Liability may be imposed, however, if the directors "participate or have knowledge amounting to acquiescence or [are] guilty of negligence in the management and supervision of the corporate affairs causing or contributing to the injury." *Id.*

Plaintiffs maintain that the Forsbergs bear responsibility for the recruiting tactics of Ed Nabors, an employee of TTI, which they allege were fraudulent. The Forsbergs respond that TTI established internal procedures to guard against "overpromising" re-

cruiting. Although the parties disagree, they both look to Carl Forsberg's deposition to validate their respective positions. Plaintiffs claim that it shows that Forsberg had notice of the recruiting methods of Ed Nabors, that he refused to take steps to avert an identical fraud, that he had independent evidence that Nabors was misrepresenting TTI to prospective students, and that prospective students were arriving with expectations that the school was unable to meet. The Forsbergs, on the other hand, maintain that the deposition establishes that TTI had sufficient internal procedures to protect against overzealous recruiters and that TTI implemented a special procedure for Nabors' recruiting.

The relevant deposition testimony concerns a report on West 57th Street, a national news television program, exposing fraudulent practices at trade schools in Arizona. On one segment of the program, which aired before TTI came into existence, a hidden camera captured a recruiting pitch by Ed Nabors where he made certain promises to potential students. Later in the program, students claimed that Nabors had made promises that were not kept by the school. Carl Forsberg saw a videotape of the program after Nabors had already been hired by TTI and Plaintiffs contend that this viewing put him on notice that Nabors was committing fraud. According to Forsberg, however, it was not clear that Nabors was entirely responsible for the practices described on the program::

Q: Was it nonetheless your understanding that the presentation—the television presentation, at least, accused Mr. Nabors of making false representations about the school?

A: I don't know if I would classify it as that harsh. My recollection of the interview, or the people presenting the show, was that their conclusion was that he had done things that were inappropriate.

. . . . . .

But whether that was Ed Nabors' fault for saying that "This is what the school told me to say" or whether it was the school's fault for not following up on things they had committed to doing, I

came away not knowing which one it was.

(Forsberg Dep. at 80–81.)

Nevertheless, the tape prompted Forsberg to discuss Nabors' recruiting methods with Terry Lass, TTI's Director of Marketing:

Q: Weren't you concerned after seeing the tape that perhaps Mr. Nabors was willing to make false statements to students in order to enroll them?

A: Terry Lass and I discussed whether we thought he was accurately portraying the enrollment at the school. And Terry Lass went away to make sure that he wasn't. Ed Nabors, I believe it was at that time, came back and volunteered to fill out that additional paperwork.

I may be wrong on the time, but I think that's when he started filling out that piece of paper saying that the school wasn't guaranteeing anything.

(Forsberg Dep. at 82.)

Although Forsberg may have been concerned about Nabors' recruiting practices, they were not actually monitored.

Q: Did you consider firing Mr. Nabors after you watched the tape?

A: I left that up to Mr. Lass. I didn't say that he had to fire him, no. I didn't recommend that he fire him. I represented that he talk to Ed Nabors and find out what he was doing and make a decision on his current recruiting practice.

Q: Did you have anybody monitor Mr. Nabors in his recruiting efforts?

A: Monitor in what way?

Q: Watch him, send somebody up with him?

A: No, we didn't.

Q: Why not?

A: We didn't have the manpower to send up to do that.

(Forsberg Dep. at 90–91.)

 Under Arizona law, the three bases for personal liability for corporate torts are participation, knowledge amounting to acquiescence, or negligent management and supervision. *Jabczenski*, 579 P.2d at 58. Forsberg's deposition, cited by both parties,

does not raise a genuine issue of material fact that he participated or had a level of knowledge equivalent to acquiescence. The details of recruiting appeared to be delegated to others, and his actual knowledge of Nabors' was limited to what others told him. However, his failure to monitor the recruiting activities of Ed Nabors does raise a question of fact with respect to negligent management and supervision that is not properly resolved on a motion for summary judgment. As a matter of state law, Forsberg might be liable for Nabors' activities under this rationale.

### 3. Dischargeability of the State Law Claim

■■■■ Of the possible bases of the Forsbergs' liability under state law, only the claim of negligent supervision survives the Forsbergs' Motion for Summary Judgment. As a matter of federal bankruptcy law, however, negligence does not constitute fraud and is insufficient to bar discharge of debts under § 523(a)(2)(A). The Supreme Court has construed § 523(a)(2)(A) as incorporating "the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular state." *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 443 n. 9, 133 L.Ed.2d 351 (1995). In determining whether conduct amounts to fraud within the meaning of § 523(a)(2)(A), the Court looks to the Restatement of Torts. *Id.* 116 S.Ct. at 444. Under the Restatement, scienter is an essential element of fraud. *Restatement (Second) of Torts* § 526 (1977). Although Arizona may impose liability on corporate directors for negligent supervision, negligence is insufficient to bar discharge of debts under the bankruptcy laws.

■■■■ Therefore, the Court will grant the Forsbergs' Motion for Summary Judgment. The Plaintiffs have failed to raise a genuine issue of material fact that the Forsbergs are personally liable for a debt that is also barred from discharge under the federal bankruptcy laws.

Accordingly,

**IT IS ORDERED** granting Defendant Zions First National Bank's Motion for Summary Judgment (doc. # 391).

**FURTHER ORDERED** granting Defendant Student Loan Marketing Association's Motion for Summary Judgment (doc. # 398).

**FURTHER ORDERED** granting Defendants Carl Forsberg and C. Colleen Forsberg's Motion for Summary Judgment (doc. # 395).

**FURTHER ORDERED** setting a status hearing regarding the prosecution of this case with respect to the remaining defendants on January 30, 1998 at 11:00 am.